RIMM, J. T. C.
This is a local property tax matter involving the valuation of vacant land for the tax years 1977 and 1978. A claim of discrimination was abandoned at the time of trial. For both years the original assessment was $135,600 and the assessments were sustained on appeal to the Ocean County Board of Taxation. The taxpayer then appealed to the Division of Tax Appeals and the matters are before the Tax Court pursuant to N.J.S.A. 2A:3A-26.
The subject property is vacant land located on the west side of State Highway 166 approximately one-half mile north of its intersection with State Highway 37. The property is designated as Block 404, Lot 66, and consists of 10.54 acres. It is T-shaped, has 338 feet of frontage on Route 166 and a depth of 725 feet from Route 166 to the Garden State Parkway where the top of the “T” borders the Parkway for 979 feet. While a portion of the frontage is at grade with Route 166, most of the property is from four to ten feet below the grade of adjoining properties. Riverside Cemetery is located across Route 166 from the property. Adjoining the property to the south are a two-story office building and nine garden apartment buildings. North of the subject is a single-family dwelling which is the beginning of a residential neighborhood. The western edge of the property is subject to a sanitary sewer easement.
*148 On both assessing dates of October 1,1976 and October 1,1977 the property was located in two different building zones. The 400 feet closest to Route 166 was zoned “HB” for commercial use. The balance of the property was zoned “R-90” for single-family dwellings. On April 4, 1975 a variance was granted permitting the construction of 62 townhouse dwelling units. Coastal Area Facilities Review Act approval was also received in 1975. Electric, gas, water and sewerage are available to the site.
The taxpayer’s only witness was a real estate appraiser who used the direct sales comparison approach to value the land. The witness testified about four comparable sales. In his appraisal, which was admitted in evidence, the witness wrote:
The appraiser compares and weighs attributes of the comparables and adjusts for such differences as time, location and the various physical characteristics of the sites.
Sale number 1 used by the witness was a tract of 104.29 acres of which 32.3 acres were usable. At the time of the sale the parcel was approved for a 110-unit condominium complex, and the indicated sales price per usable acre was $14,628. After making adjustments for the comparable sale to the subject— downward for the comparable sale’s superiority as to location, drainage and topography, and upward for time, the sale having occurred in August 1975, and for size — the witness said that this comparable sale indicated a value of $7,800 an acre for the subject. The testimony also disclosed that this sale was between two related corporations.
Sale number 2 involved a 3.47-acre tract with an indicated per acre sale price of $31,700. At the time of the sale the parcel had been approved for a 28-unit apartment building. The witness himself said that adjusting this property to the subject in the direct sales comparison approach presented a “whole host of problems.” Nevertheless, he made an upward adjustment for time and downward adjustments for location, topography, drainage, size and shape, and concluded that this comparable sale indicated the subject had a per acre value of $9,200. On cross-examination by the township solicitor, when the witness *149 was asked how he made his adjustment for location, the witness said:
Oh, I didn’t use a specific factor for, for a location adjustment. You have to base your, your experience of 12 years of people buying and selling property and seeing what their objections are, and also 12 years of appraisal experience in order to, you know, make these adjustments.
When pressed by the solicitor the witness said his adjustment for location was “probably somewheres in the range of 25% or so.”
Sale number 3 was a 32.303-acre tract which abuts the subject in the rear of both tracts. It had an indicated price of $18,320 an acre. Adjustments were made for size, drainage, topography and shape. The witness said that this comparable sale indicated that the subject property had a value of $9,300 an acre. At the time of the sale the parcel was approved for a 183-unit condominium complex. During cross-examination by the township solicitor on adjustments for this comparable, the following questions and answers appear in the record:
Q. How did you reach the adjustment for drainage?
A. Drainage. I really couldn’t come up with anything, um, ah, in terms of hard and fast facts because I don’t really have the engineering background to determine the size difference in the pipes but it’s obvious that there is drainage that has to be taken care of from the State Highway system, that dumps on to the property, and somebody has to take care of the drainage from the Presidential Apartments. Uh, I, I looked at it. I said any buyer is going to consider this a negative factor, and I had to make an adjustment. Not to adjust would be highly improper.
Q. So you simply chose the number of twenty-five per cent?
A. Yes.
Comparable sale number 4 involved a 7.95-acre, highly irregularly-shaped tract with an indicated sale price of $18,490 an acre. Adjusting this sale for time, location, drainage, topography and utility, the witness said that it indicated that the subject had a value of $8,000 an acre. At the time of this sale the parcel had been approved for a 71-unit apartment complex.
In addition to testimony on those four comparable sales, the witness testified about the marketing history of the subject *150 property. The property had been listed for sale for $125,000 since the variance was obtained. The property had not been sold as of March 17, 1980. Based on his “experience,” the witness said that property listed within 15% of its market value normally sells fairly rapidly. Therefore the witness set a current upper limit of value on the subject of approximately $106,000. He adjusted this value for time and said that the value of the property indicated by the listing was $90,100 on October 1, 1976 and $95,400 on October 1, 1977.
On the basis of his direct sales comparison approach, the witness concluded that the value of the subject was $89,600 on October 1, 1976 and $94,100 on October 1, 1977.
Upon questioning by the court the taxpayer’s witness testified that all four comparable sales he used gave him “a lot of problems.” Indeed, the number of adjustments, the failure of the witness to support and justify the adjustments, the nature of the differences between the subject and each comparable sale, and the distances of the comparable sales from the subject, except for comparable sale 3, make the plaintiff’s comparable sales data meaningless for purposes of establishing the value of the subject property.
One of the pitfalls frequently encountered by appraisers “is the problem of support, justification, and documentation of the adjustments used in the Direct Sales Comparison Approach.” Terry, “Support and Justify: An Associate’s Problem,” The Real Estate Appraiser and Analyst (September-October 1978), at 28. Adjustments, if they are to be of use to the court in determining value, must be supported and justified. In order to make proper adjustments, the appraiser is required to “go into the market and get the data.” Ibid. The plaintiff’s appraiser did not “get the data” to support, justify and document his adjustments. An appraiser should “not make adjustments for the sake of an adjustment .... [Appraisers, are interpreters of the market, [they] do not make the market.” Id. at 31.
*151 While listings may be a part of the market data approach, they must be
... analyzed in much the same way as are actual sales. The same qualifications are made: number of listings, period of time covered, terms (cash or contract), rate of turnover, motivating force, and degree of comparability. [American Institute of Real Estate Appraisers, The Appraisal of Real Estate (7th ed. 1978), at 293]
No analysis of the listing was made on the basis of which the court may regard it as a meaningful comparable “sale.” The terms of the listing were not indicated. There was no testimony of marketing efforts or of offers received, if any. There was also no justification for an arbitrary reduction of 15% in the amount of the listing. Saying that a property listed within 15% of its market value normally sells fairly rapidly and then deducting 15% from the listing amount to arrive at value is a complete non sequitur.
In an appeal to the Tax Court, there is a presumption that the county board judgment is correct. Riverview Gardens v. North Arlington, 9 N.J. 167, 87 A.2d 425 (1952); Glenwood Realty Co., Inc. v. East Orange, 78 N.J.Super. 67, 187 A.2d 602 (App.Div.1963). The presumption stands until it is overcome by sufficient competent evidence. Aetna Life Ins. Co. v. Newark, 10 N.J. 99, 89 A.2d 385 (1952); Spiotta Bros. v. Mine Hill Tp., 1 N.J.Tax 42 (Tax Ct. 1980). There was not sufficient competent evidence in the present case to overcome the presumption of correctness in favor of the county board judgment. The taxpayer’s witness’ testimony is rejected because of his failure to adequately support his valuation approach. The weight to be given to an expert witness’ opinion depends “especially on the facts and reasoning which are the foundation of [his] opinions.” Passaic v. Gera Mills, 55 N.J.Super. 73, 90, 150 A.2d 67 (App.Div. 1959).
The judiciary and fact-finding bodies are not bound by the opinions of expert witnesses. Wright v. Purepac Corp., 82 N.J.Super. 100, 111, [196 A 2d 695] (Cty.Ct.1963). The weight to be given to an expert’s opinion depends especially upon the facts and reasoning which are offered as the foundation of his opinion. Ocean Cty. v. Landolfo, 132 N.J.Super. 523, 528 [334 A.2d 360] (App.Div.1975).
*152 The weight and value of expert testimony are for the trier of the facts. Robbins v. Thies, 117 N.J.L. 389, 398 [189 A. 67] (E. & A. 1937). An expert’s opinion may be adopted in whole or in part or completely rejected. Middlesex Cty. v. Clearwater Village, Inc., 163 N.J.Super. 166, 174 [394 A.2d 390] (App.Div.1978), certif. den. 79 N.J. 483 [401 A.2d 239] (1979). [Atlantic City v. Atlantic Cty. Bd. of Taxation, 2 N.J.Tax 30, 42-43 (Tax Ct. 1980) ]
At the conclusion of plaintiff’s case there was no motion to dismiss the complaints, and the municipality called its assessor as an expert witness. He testified that he agreed with plaintiff’s expert’s description of the physical characteristics of the subject property. However, his use of the direct sales comparison approach indicated a value for the property of $179,200 on both October 1, 1976 and October 1, 1977.
This witness also used four comparable sales. The first was a 35.94-acre tract with an indicated per acre price of $17,348. The second comparable sale was a 9.76-acre tract with an indicated price of $24,600 an acre. Comparable sale 3 was a 3.95-acre tract with an indicated price of $13,914 an acre. The township’s fourth comparable sale was the same as plaintiff’s comparable sale number 3. The assessor testified that this parcel is contiguous to the subject for 255 feet along the top of the “T” portion of the subject where both properties border the Garden State Parkway. Based on the assessor’s opinion that the tract had 31.7 acres, slightly less than that indicated by plaintiff’s witness, he indicated a per acre price of $18,668.
The assessor concluded that the subject had a value of $17,000 an acre, or a total value of $179,200 rounded.
The assessor’s testimony suffered from the same deficiencies as that of the taxpayer’s witness. Under the circumstances, the presumption of correctness has not been overcome and the court cannot disturb the assessment fixed by the county board judgment.
The Clerk of the Tax Court will enter a judgment that the complaint be dismissed.