KAHN, J.T.C.
This matter involves an appeal by taxpayer from the judgment of the Passaic County Board of Taxation. The property, known as Block CO 373, Lot 1 and Block CO 374, Lot 1, was assessed for 1983 and judgment was entered by the county board as follows:
Assessment County Board
Block CO 373, Lot 1
Land 66,000 66,000
Improvements 1.140.500 1.040.500
Total 1.206.500 1.106.500
Block CO 374, Lot 1
Land 50,000 50,000
Improvements 256.000 253.500
Total 306.000 303.500
Taxpayer filed separate complaints for each block; the municipality filed no responsive pleadings. At the start of trial, taxpayer made a motion to withdraw its complaint as to Block 374, Lot 1 and the municipality objected. I reserved decision at that time.
Both parcels of property are utilized by the taxpayer for chemical manufacturing and contain heavy industrial buildings. Block 373, Lot 1 contains one main building and several smaller structures resulting in total improvements of 44,480 square feet on a 51,400 square-foot lot. Block 374, Lot 1 contains approximately 83,520 square feet of improvements on approximately 114,000 square feet of land.
Running between the two aforementioned lots is that which is identified as Shady Street. It is uncontroverted that Shady *124 Street was vacated by the municipality a number of years prior to the assessment date and is now occupied by taxpayer. In fact, photographs and other evidence indicate that the improvements on the two parcels are connected by an above-ground bridge-type construction running over Shady Street and occupied as part of the chemical manufacturing company. In general, taxpayer sought to establish the values of Block 373, Lot 1 and Block 374, Lot 1 based upon its position that (1) each lot and block consisted of a separate economic unit for valuation; and (2) plaintiff had an absolute right to withdraw its complaint in the parcel known as Block 374, Lot 1. The municipality, on the other hand, utilized an appraisal encompassing both parcels, contending that the two parcels should be valued as one since they are commonly owned by the taxpayer and utilized for the same manufacturing process. The municipality also argues that the more valuable improvement, that which is located on Block 374, Lot 1, is ridiculously underassessed at $303,500, as the improvements are far more recently constructed and have a greater value. Equitable principles, it is argued, require the court to deny the motion and value both parcels as one.
I determine that justice is better served by denying taxpayer’s motion to withdraw the complaint for Block 374, Lot 1, in this case. Certainly there is ample authority which would initially support the court’s allowing said withdrawal. R. 8:3-9, specifically applicable to the Tax Court cases, states:
Whether or not a responsive pleading has been filed, a complaint or a counterclaim may be withdrawn at any time prior to the close of proofs before the Tax Court and thereafter with leave of the court.
Judge Conley, in Cherry Hill Tp. v. U.S. Life Insurance Co., of N.Y., 1 N.J.Tax 236, 176 N.J.Super. 254, 422 A.2d 810 (1980) considered the same question. In that case, Judge Conley indicated:
In short, there is no authority to prevent plaintiff from withdrawing its appeal as requested in this case. Indeed, R. 8:3-9 permits such a withdrawal. The practice in the Tax Court in this respect is different from practice in the Superior Court. Dismissal of an action resulting from a plaintiff’s timely withdrawal of its complaint is not upon terms and conditions set by the court. In the case of such a withdrawal, entry of the judgment of dismissal is a *125 ministerial act carried on by the Clerk of the Tax Court. [Id. at 261-262, 422 A.2d 810]
In this case, however, the factual situation requires the opposite conclusion. Two complaints were filed by the taxpayer involving two separate blocks and lots with improvements thereon. Admittedly, there is a bridge-type improvement joining both buildings over Shady Street, a street vacated by the City of Paterson. Admittedly, the properties have been utilized as a chemical-production business under one use and ownership. Although taxpayer’s expert indicated that the improvements on each lot could be sold and therefore have separate and distinct value, I find that the past history of the property indicates that the improvements are really one. Block 373, Lot 1, contains 44,480 square feet of improvements constructed approximately 50 years ago. Block 374, Lot 1, the block and lot which is the subject of taxpayer’s requested withdrawal, contains 83,520 square feet of improvements constructed approximately 15 to 16 years ago. The assessment on Block 373, Lot 1, is $1,206,-500 and the assessment on Block 374, Lot 1, obviously much greater in size and newer construction, totals $306,000. Granting taxpayer’s motion would result in a lot with larger and more recently constructed improvements retaining a very small assessment while the taxpayer could conceivably receive a reduction in the assessment for Block 373, Lot 1, which contains the smaller and older improvements. The municipality has attempted to assess the parcels as one improvement located on two separate lots and blocks, straddling a vacated street; and conceivably city’s assessor failed to accurately apportion the total assessment relative to the location and value of improvements. I find that to grant taxpayer’s motion, although appropriate under R. 8:3-9, would create an inequitable result. R. 1:1-2 allows this court to relax or dispense with any rule (part I through part VIII, inclusive) if adherance would result in an injustice. There is also additional authority for denial of such a motion based upon equitable principles.
In considering an application of Chapter 123, certainly not the precise facts as in the instant case, the court in Weyerhaeuser *126 Co. v. Closter Bor., 190 N.J.Super. 528, 464 A.2d 1156 (App. Div.1983) considered the right of a party to withdraw a claim. The court stated as follows:
To allow a taxing district to benefit in a Devonshire [Develop. Assoc. v. Hackensack, 184 N.J.Super. 371, 2 N.J.Tax. 392, 446 A.2d 201 (1981)] situation (where the taxpayer lacks the foresight to withdraw his claim of discrimination) and also to withdraw its own discrimination claim up until the close of proof (under R. 8:3-9) seems to be a good example of legal gamesmanship which cannot be condoned by this court. Tax appeals will become a game of inserting and withdrawing claims as the proofs are elicited. We hold that once discrimination has been made an issue in a tax appeal, if one party withdraws its claim, the other party must in fairness be allowed to amend its complaint to include the claim. [Id. at 543, 464 A.2d 1156]
In Clinton Tp. Citizen’s Comm. v. Clinton Tp., 185 N.J.Super. 343, 448 A.2d 526 (Law Div.1982), Tax Court Judge Conley, temporarily assigned to the Superior Court, granted an injunction preventing the governing body from withdrawing Tax Court complaints without the consent of the assessor or the consent of the Tax Court. This decision would appear to be in conflict with Judge Conley’s decision in Cherry Hill Tp., supra. Judge Conley distinguished Cherry Hill stating that he was concerned about an adversary party protecting its interest by filing an appropriate pleading. Although Judge Conley acknowledged that, generally, the governing body has the right to withdraw complaints that had been filed in the Tax Court, the court further stated:
The facts of this case call for an exercise by this court of its inherent equitable powers. We note that the Tax Court also has equitable powers and we are confident it will invoke them in situations similar to these. N.J.S.A. 2A:3A-4a.[1] The undisputed facts adduced in this action reflect a disturbing insensitivity on the part of a defendant’s governing body to the integrity of the tax assessing system, [Id. at 358, 448 A.2d 526]
I find that to allow the taxpayer to withdraw the complaint for Block 374, Lot 1, will result in a use of the pleading process as a form of gamesmanship. It is clear that the municipality was led to believe by the filing of two complaints that it could litigate and receive a determination on both lots. It is also *127 clear from the appraisal submitted by the municipality as well as the testimony offered by the municipality’s expert, that it considered the parcels as one economic unit for disposition. Taxpayer’s expert opined that each lot and block and the improvements thereon constituted a separate entity for purpose of valuation and he rendered an opinion as to the valuation of each such parcel. This court still must consider the proofs of both parties and make a determination based upon the evidence submitted as to true value of the subject parcels. The present assessment strictly comparing the assessment to the square footage of improvements for each of the two lots clearly reflects an inappropriate allocation regardless of whether taxpayer is entitled to a reduction on either of the two parcels. Justice and fairness is clearly served by the denial of plaintiff’s motion to withdraw the complaint for Block 374, Lot 1.
Both parties utilized the cost reproduction approach as well as the income capitalization approach to value. Both utilized computerized factors and information, along with their own expertise, in choosing what they deemed to be the right method of computation. Because a substantial portion of the improvements were constructed approximately 50 years ago, I find the cost reproduction approach is an inappropriate method for consideration in this case. I also note that both experts provided little support and authority for the selection of the variables and numerous factors used in their computations.
Taxpayer also attempted to utilize the market sales approach. His expert attempted to compare the subject property with other purportedly similar properties. Taxpayer’s witness candidly indicated that none of the comparables were chemical plants with the type of equipment utilized for chemical processing. He stated that the buildings on the comparable properties were in much better physical condition than the subject. The witness indicated that he did not make specific adjustments for any of the factors such as size, time and location, but merely used an overall approach, representing that he was familiar with property in the area and on that basis *128 alone he rendered an opinion as to valuation. I find that this methodology, too, lacks specificity with respect to calculation and adjustment upon which the court can rely.
The taxpayer’s expert, with respect to his income approach, indicated that in his opinion Block 373, Lot 1, contained an industrial area of 34,400 square feet and 10,080 square feet of office space. He indicated that economic rent for the office area was $5 a square foot and for the industrial area, $3.50 a square foot, for a total of $170,800 on an annual basis. He did not allow for any expenses or vacancy as a deduction from gross income. His capitalization rate was based upon a mortgage equity technique as follows:
•Mortgage ratio 75% x 14.9 % 11.2 %
Equity ratio 25% x 16. % 4. %
Adjusted tax rate 8.70 X 54.52% 4.73%
Total capitalization rate 19793%
These figures were arrived at, according to the witness, by an estimation of typical financing for the property which would be a 75% mortgage at an interest rate of 14% over a 20-year period, reflecting an annual mortgage constant of 14.9%. He indicated that a prospective investor’s required return would be 16% for the 25% cash payment made by such an investor. Essentially, the taxpayer offered no documentary evidence for these figures, but again referred to his general experience in real estate. He divided the net income of $170,800 by the aforementioned capitalization rate of 19.93%, reflecting a total value of $856,999 rounded to $857,000 for Block 373, Lot 1.
For Block 374, Lot 1, the witness’s approach was the same. He indicated that the improvements on Block 374, Lot 1, although newer in age, required more work to put them in shape to be utilized and was not as generally marketable as the improvements on Block 373, Lot 1. He, therefore, concluded that the economic rent was $2.40 a square foot. He multiplied this by 47,000 square feet, making a total of $112,800. I should point out at this time that the witness admitted on cross-exami *129 nation that, in fact, he neglected to appraise, view and consider approximately an additional 30,000 square feet of building space on Block 374, Lot 1. His capitalization process was identical to his opinion as the previously described block and lot. His capitalization rate of 19.93% was divided into $112,000, making a total valuation as opined by the witness of $565,980, rounded to $566,000, for Block 374, Lot 1. The witness referred to little, if any, documentation in order to support his opinion as to the ingredients of the capitalization process. I should also point out that he conceded that his selected economic rent for both parcels was based upon net leases which require taxes to be totally paid by the tenant. When asked why he included the adjusted tax rate in his capitalization rate, he indicated that he always included the adjusted tax rate in his capitalization rate.
The municipality, through its expert, also utilized and depended upon an income capitalization analysis. The witness stated that the two parcels under review by this court were, in fact, one economic unit. He indicated that the history of the parcel was that same was a chemical processing plant and all improvements on both lots were utilized by a common owner for the same purpose. He, therefore, appraised same on that basis. He utilized comparable rentals in order to arrive at a $3.50 a square foot economic rent for all improvements. He indicated that 128,000 square feet of such space totaled $448,000, rounded to $450,000, as annualized rent. He allowed for a vacancy factor of 5% of gross rent ($22,500) reflecting the opinion that an appropriate valuation technique would allow some vacancy and rent loss possibility. Expenses, he indicated, were minimal and limited to structural repairs, certain types of blanket insurance and management of a single-tenant occupancy with a net lease. The witness allowed 15% on a standardized basis or $64,125, based upon his experience. Deducting the vacancy and 15% for expenses, he arrived at a net operating income to the property of $363,375.
The municipality’s witness arrived at an overall capitalization rate of 13.25%. He considered competing investments, mort *130 gage rates, utilizing various tables from the American Council of Life Insurance, as well as his experience in appraising industrial and commercial real estate, and financing of same. In actuality, in certain contexts, his opinion did not differ very significantly from the opinion of the taxpayer’s appraiser. He also felt that a 75% mortgage would be available, however, at 1472% for a 25-year term with a mortgage constant of 14.91. He indicated that, based upon his experience, an investor would be required to invest 25% of the purchase price and would expect an 11% return on his cash investment. He also relied upon his schedule of competing investments available at the appropriate assessment date and restated in his report. ' The witness produced a mortgage factor of 11.18% (75% X 14.91%) added to a return on equity factor of 2.75% (25% x 11%), totaling 13.93%. He also considered that an equity build-up factor of .65% should be deducted, which resulted in a final capitalization rate of 13.28%. He computed the equity build-up factor by multiplying the mortgage portion (75%) by .087%. The witness offered no further explanation for this procedure. He finally arrived at a 13.28% rate rounded to 13.25%.
I find the taxpayer’s capitalization approach generally unreliable. Although both witnesses produced the same mortgage factor, the taxpayer postulates a 16% return required upon invested capital but shows no data in support thereof. Additionally, taxpayer’s witness stated that, in his opinion, the subject property would be rented on a net basis (taxes being the obligation of the tenant, not the landlord). The witness, however, curiously included as a significant factor in his capitalization rate, the adjusted tax rate. Clearly there is no support for this procedure since the witness admitted that the tenant would be obligated to pay the taxes. Taxpayer’s testimony, also, does not provide for a vacancy factor or any expense factor, whatsoever, which further demonstrates a lack of comprehension of the considerations required to appropriately appraise income producing property.
*131 I find the municipality’s testimony far more reliable. The use of benchmarks such as the American Council of Life Insurance tables may constitute acceptable authority for the opinions rendered by an expert. The New Jersey Supreme Court in Glen Wall Associates v. Wall Tp., 99 N.J. 265, 491 A.2d 1247 (1985) stated as follows:
Although derivation of an overall capitalization rate from comparable sales is the preferred technique, it is not the only technique. That a capitalization rate can be calculated from an examination of alternative investments has been recognized by the Tax Courts. [Id. at 279, 491 A.2d 1247]
It is axiomatic that a party’s contentions may rise or fall on the validity of the testimony offered. In Schmertz v. Dover Tp., 4 N.J.Tax 145 (Tax Ct.1982), taxpayer’s real estate appraiser utilized the direct sales comparison approach and testified as to two vacant sales of land. He indicated adjustments were made considering location, topography, drainage, size and shape. On cross-examination the witness states, however:
Oh, I didn’t use a specific factor for, for a location adjustment. You have to base your experience on 12 years of people buying and selling property and seeing what their objections are, and also 12 years of appraisal experience in order to, you know, make these adjustments. [Id. at 149]
The Schmertz court reasoned as follows:
Upon questioning by the court, the taxpayer’s witness testified that all four comparable sales he used gave him “a lot of problems.” Indeed, the number of adjustments, the failure of the witness to support and justify the adjustments, the nature of the differences between the subject and each comparable sale, and the distances of the comparable sales from the subject, except comparable sale 3, make the plaintiff’s comparable sales data meaningless for purposes of establishing the value of the subject property. [Id. at 150]
See also Passaic v. Gera Mills, 55 N.J.Super. 73, 90, 150 A.2d 67 (App.Div.1959).
The taxpayer’s witness’s testimony fits the description of the testimony rejected by the court in Schmertz, supra.
I find that the entire two parcels contained 128,000 square feet of space which should be valued as one industrial parcel at $3.50 a square foot. Annualized gross income for the property, therefore, is $450,000.
I find credible an allowance of 5% for vacancy and collection losses, totaling $22,500, as well as a 15% expense allowance *132 consisting of structural repairs, blanket insurance, and management totaling $64,123, resulting in a net operating income of $363,375. With one exception, I accept the municipality’s capitalization rate on an overall basis as having been grounded in better fundamental appraisal techniques considering alternate investments, mortgage interest and capitalization rate information published by the American Council of Life Insurance. I have already indicated my rejection of taxpayer’s witness’s proposed capitalization rate as not having been supported by authority.
I find, however, that although equity build-up may be a proper consideration as an ingredient in a capitalization rate, the municipality’s witness failed to sufficiently produce the basis upon which his factor for equity build-up emanated as well as authority for its use in this type of property. Accordingly, I find that the most reliable evidence on the capitalization rate is the municipality’s proposal (13.93%). This excludes the equity build-up factor (.65).[2] Dividing the capitalization rate into the aforementioned operating income of $363,375 results in a valuation of $2,608,579. Combining the assessments for the two parcels totals $1,512,500. When said assessment is divided by my finding of true value, the ratio of assessment to true value is 57.98%. The average ratio for the tax year 1983, as promulgated by the Director of the Division of Taxation, is 55% with an upper limit of 64% and a lower limit of 47%. The resulting calculation clearly places the ratio of assessment to true value as I have found (57.98%) well within the corridor created by the aforementioned upper and lower limit. As a result, the assessments must be affirmed.
One further note involves the aforementioned discussion concerning the inconsistent assessments upon the two subject parcels. Block 373, Lot 1, consisting of some 44,480 square *133 feet of 50-year old improvements, contains an assessment of $1,206,500; whereas Block 374, Lot 1, consisting of some 83,520 square feet of more recently constructed improvements, contains an assessment of $306,000. The apportionment of the present assessment for each parcel is disproportionate. This court is not ordering a change in the assessments for the specific blocks and lots, but urges the City of Paterson, through its assessor’s office, to take action to allocate assessments consistent with this opinion.
The Clerk of the Tax Court is hereby directed to enter judgment affirming the assessments as follows:
Block 373, Lot 1:
Land $ 66,000
Improvements $1,140,000
Total $1,206,500
Block 374, Lot 1:
Land $ 50,000
Improvements $ 256,000
Total $ 306,000

 N.J.S.A. 2A:3A-4a provides: The Tax Court, in all causes within its jurisdiction, and subject to law, may grant legal and equitable relief so that all matters in controversy between the parties may be completely determined.

 Capitalization rate comprised of a 75% mortgage factor of 14.91% mortgage constant equaling 11.18% and 25% equity return factor at 11% or 2.75% totaling 13.93%.