RIMM, J.T.C.
There are before me three local property tax matters involving valuation and discrimination for the tax year 1996 which were consolidated for trial.
The case of Atlantic City v. Frances Ginnetti, docket number 9185-96, involves block C0010, lot 19. The property is located at the northeast corner of Sovereign Avenue and the Boardwalk. For the tax year 1996, the original assessment and the county board judgment were as follows:
*358 Original Assessment County Tax Board Judgment
Land $3,970,100 $1,986,300
Improvements 15,400 15,400
Total $3,985,500 $2,001,700.
The case of Atlantic City v. Ginnetti, docket number 9180-96, involves block C0010, lot 17, located at the southeast corner of Sovereign and Pacific Avenues. The original assessment and county board judgment for 1996 were as follows:
Original Assessment County Tax Board Judgment
Land $1,552,000 $ 436,500
Improvements 6,800 6,800
Total $1,558,800 $ 443,300.
The case of Atlantic City v. Ginnetti, docket number 9183-96, involves block C0010, lot 20, which is contiguous to lot 17 and just south of it. The original assessment and the county board judgment for 1996 were as follows:
Original Assessment County Tax Board Judgment
Land $ 639,000 $ 179,700
Improvements 2,800 2,800
Total $ 641,800 $ 182,500.
In each case, the city filed a complaint seeking an increase in the assessment from the county board judgment. In each case, the taxpayer filed a counterclaim seeking a further reduction below the county board judgment.
Lots 17 and 20, which are, as indicated, contiguous are separated from lot 19 by lots 21 and 18. Lot 21 is owned by defendant, Frances Ginnetti, but was not appealed. Lot 21 contains 6 square feet, having .06 feet of frontage on Sovereign Avenue by a depth of 100 feet. It was assessed for a total of $1,000.00. It is immediately to the south of and contiguous to lot 20. Separating lots 17, 20 and 21 from lot 19 is lot 18, owned by GNOC, Corp., the corporation doing business as the Atlantic City Hilton (Hilton), across Sovereign Avenue from the subject properties.
*359 In valuing the three lots under appeal, the city’s appraiser added in the value of lot 21, not under appeal, and treated the four lots as one economic unit. He explained that, even though lot 19 was separated from the other three lots by lot 18, the lots under appeal would be bought and sold as one parcel. Essentially, his opinion that the three lots under appeal, together with lot 21, constitute one economic unit and should be valued as such was based on the current operation of the lots as parking lots and on his opinion that the highest and best use for the properties is for absorption and development into a casino hotel for casino or related uses.
The taxpayer’s appraiser used a different approach in valuing the properties before the court. He valued lot 19, which consists of a parking lot, a flea market and snack stand along the Boardwalk, as one economic unit. He valued lots 17 and 20, used as a parking lot, as a separate economic unit, combining them with the small lot 21.
As I understand defendant’s appraiser’s approach to the valuation of the properties as two separate economic units, it is based on his opinion that the lots with Pacific Avenue frontage might ultimately be used for retail purposes, such as a jewelry store, a pawn shop or other similar, related activities of which there are various examples in the city spawned by the casino industry. Lot 19, the lot with boardwalk frontage, would be used for parking and the development of retail stores along the Boardwalk.
The subject lots, including the taxpayer’s lot 21 and lot 18, owned by Hilton, comprise almost exactly one-half of the city block bounded by Sovereign, Pacific and Montpelier Avenues and the Boardwalk. Lot 17 contains 9700 square feet with 97 feet of frontage on Pacific Avenue and 100 feet of frontage on Sovereign Avenue. Lot 20 contains 3,994 square feet, with 39.94 feet of frontage on Sovereign Avenue with a depth of 100 feet. As indicated, lot 21 contains six square feet. Lot 19 contains 24,813 square feet, having 245.27 feet of frontage on Sovereign Avenue and a frontage on the Boardwalk of approximately 100.16 feet. Each of the individual lots is rectangular in shape.
*360 According to plaintiff’s expert, the four lots together contain 38,513 square feet. According to defendant’s witness, the four lots contain 38,529 square feet. The difference is insignificant, the parties have stipulated that the total area is 38,513 square feet. I shall use the latter area in determining the value of the subject property.
The properties are all located within the RSC, resort commercial development zone. The purpose of this zone, as set forth in defendant’s appraisal, “is to provide for the city’s main industry, consisting predominantly of transient and tourist-oriented uses, at such intensity as is justified by the city’s limited land resources, high land values and infrastructure capacity.” City of Atlantic City, N.J., Code ch. 163, (Land Use Development) pp. 16431-32 (1988). Among the uses permitted in the RSC zone are hotels and casino-hotels.
Before dealing with the specifics of the valuation issue, several observations must be made. The first is that, to quote from the case of City of Atlantic City v. Atlantic County Board of Taxation, 2 N.J. Tax 30 (Tax 1980), aff'd per curiam, 4 N.J. Tax 685 (App.Div.1982), certif. denied, 93 N.J. 250, 460 A.2d 659 (1983), “Atlantic City is unique. Of all of the 567 municipalities in the State of New Jersey, it is the only municipality mentioned by name in the State Constitution. New Jersey Constitution (1947) Art. IV, § VII, par. 2D. The financial well-being of the city is also of the utmost importance not only to the city itself and to its taxpayers but to the county, the region and to the entire state.” City of Atlantic City, supra, 2 N.J. Tax at 43.
This unique nature imposes on litigants, lawyers and on the Tax Court itself, difficult valuation issues. The real estate market in Atlantic City does not necessarily behave in the same manner as real estate markets behave in other localities.
Secondly, it is difficult to find comparable sales of property in Atlantic City, when valuing properties by the comparison sales approach, because of zoning considerations, proximity to existing casino-hotels, the city infrastructure, and the broad spectrum of sellers and buyers who have participated in the real estate market *361 in Atlantic City, as either developers or speculators, since the inception of gambling in 1978. Complicating all of this is the fact that Atlantic City suffered from the decline in the real estate market as a result of the savings and loan debacle, just as the rest of the country did. Therefore, in many instances, there is a dearth of comparable sales for valuing property in Atlantic City. Yet, I must use the information that has been presented to me by way of facts and expert opinion to ultimately fix the assessable values of the subject properties. Consider for example, Cigolini Assocs. v. Fairview, 208 N.J.Super. 654, 665, 506 A.2d 811 (App. Div.1986), in which the court said, “[fjurther, in deciding the ease we recognize that in the absence of sales it may not be easy to determine the value of the units in the [subject property]. But we find that circumstance not to be germane for it is not unusual for property which is difficult to value to be assessed. See, e.g., Hackensack Water Company v. Borough of Old Tappan, 77 N.J. 208, 390 A.2d 122 (1978).” I am also admonished by the Supreme Court to find value. Ford Motor Co. v. Township of Edison, 127 N.J. 290, 604 A.2d 580 (1992).
Third is the obvious fact that there is an extraordinary difference in opinion between the experts in this case as to the value of the subject property. Both experts are experienced appraisers. Plaintiffs appraiser is an MAI. Defendant’s expert witness is employed by an MAI who also signed defendant’s appraisals marked in evidence. Both experts had available to them the same information by way of discovery, and yet one expert gave an opinion of value of the subject property of $8,690,000. The other expert gave an opinion of the combined value of the properties of $1,245,675. The range of market prices per square foot of land unadjusted, from both experts, is from a low of $6.60 per square foot to a high of $262 per square foot.
No doubt, this case is a classic example of the kind of case which resulted in the principle of law that a court may accept an expert’s opinion, may reject an expert’s opinion in total, or may accept part of an expert’s opinion and reject other parts of it. The Judiciary and fact-finding bodies are not bound by the opinions of *362 expert witnesses. Wright v. Purepac Corp., 82 N.J.Super. 100, 111, 196 A.2d 695 (Cty.Ct.1963). The weight to be given to an expert’s opinion depends especially upon the facts and reasoning which are offered as the foundation of his opinion. Ocean County v. Landolfo, 132 N.J.Super. 523, 528, 334 A.2d 360 (App.Div.1975). The weight and value of expert testimony are for the trier of the facts. Robbins v. Thies, 117 N.J.L. 389, 398, 189 A. 67 (E. & A.1937). An expert’s opinion may be adopted in whole or in part or completely rejected. Middlesex County v. Clearwater Village, Inc., 163 N.J.Super. 166, 174, 394 A.2d 390 (App.Div.1978), certif. denied, 79 N.J. 483, 401 A.2d 239 (1979).
One other observation is also important. The factual findings in this case are based on the record, as they must be in every case. I make this point because it must be understood that the valuation of real property in Atlantic City is a unique process, given the nature of the market, the sometimes limited number of sales for comparison purposes and the extraordinary financing arrangements which characterize almost every sale of casino-related property in the city. It must therefore be clearly understood that the decision in this case applies to this case only and not necessarily to the valuation of other casino-related property.
Both experts relied on the sales comparison approach to valuation. The sales comparison approach to valuation “is the process in which a market value estimate is derived by analyzing the market for similar properties and comparing these properties to the subject property.” Appraisal Institute, The Appraisal of Real Estate, 397 (11th ed.1996). It is the principal method used for the valuation of vacant land, which is essentially the nature of the subject properties. In that regard, I conclude that the improvements add no value to the land. In fact, demolition costs should have been considered, but they were not by either expert.
The proper way to value the subject properties is to value them together with block C0010, lot 21, all as one economic unit, as the city’s appraiser did. Authority for such an approach can be found in two Tax Court eases. The first is Purex Corp. v. *363 Patterson, 8 N.J. Tax 121 (Tax 1986). The second is Mobil Oil Corp. v. Greenwich Tp., 9 N.J. Tax 128 (Tax 1986). The fact that the taxpayer did not originally appeal the assessment on block C0010, lot 21, to the Atlantic County Board of Taxation, and the fact that the city did not appeal the assessment on that lot in the Tax Court, does not detract from the fact that there is one economic unit and that it is perfectly proper and authorized by the case law to treat all of the lots, those under appeal and the one not under appeal, as one economic unit. The properties will be valued accordingly. What impact, if any, the inclusion of block C0010, lot 21, will have on the ultimate determination of the assessable value of the subject property will be discussed in connection with the issue of discrimination.
In valuing property, the appraiser’s first step is to consider the highest and best use of the property. For purposes of determining value, I conclude that the subject properties are basically vacant ground and are to be valued as though vacant.
Highest and best use has been defined as follows:
The reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum profitability.
[American Institute of Real Estate Appraisers, Dictionary of Real Estate Appraisal, 171 (3rd ed. 1993).]
Plaintiffs appraiser states in his appraisal that, “given the realities of the dominance of the gaming market over all other alternatives, and the gaming industry’s need for greater assemblages to expand facilities, the highest and best use as if vacant and available is for absorption/development into a casino hotel for casino or related uses.”
Defendant’s expert, in his appraisal, concludes “that the highest and best use of the land as if vacant would be holding in speculation for future use with parking lot and commercial use as an ‘interim’ use until economic conditions warrant development permitted under the zoning regulations.”
*364 In reality, upon close analysis, both appraisers conclude that the highest and best use of the property is for assemblage in accordance with the permitted uses under the zoning ordinance. The zoning ordinance permits casino construction, and I find that the highest and best use of the subject property is for assemblage into casino-hotel use. In fact, as will be pointed out, defendant’s appraiser actually says that the subject properties have no value for interim use purposes.
In accepting the city’s appraiser’s approach that the properties are to be valued as one economic unit, I conclude that the properties are one economic unit because of their highest and best use for development into a casino property or for development by a casino property for related uses. Notwithstanding that lot 19 is separated from the other lots, I conclude that, based on the totality of the evidence before me, no one would purchase lot 19 without lots 17, 20 and 21 and no one would purchase lots 17, 20 and 21 without lot 19. They are presently operated together by defendant as parking lots; they would be sold together as one parcel of land; and they would be developed together for casino use or casino-related use. In addition, as will be pointed out, of the five sales used to value lot 19 by defendant’s appraiser and the five sales used to value lot 17 and 21, three are exactly the same. Interestingly enough, there is absolutely no evidence before me that defendant would sell the lots separately or that she does anything other than operate them together and consider them as one economic unit. The latter fact is buttressed by her conversation with Wallace R. Barr, President of Hilton, to which I shall refer later in this opinion.
Plaintiffs sale number one involves the sale to Bally’s Park Place, Inc., the operator of Bally’s Park Place Casino Hotel, of a lot containing 21,684 square feet. The deed was dated January 10, 1996, which is after the assessing date in this matter of October 1, 1995. It is, however, entirely reasonable to assume that the contract on the basis of which the sale took place was dated before January 10, 1996, and therefore the agreed upon *365 price between the parties was probably arrived at not long after October 1,1995, if not before.
Since there are a number of sales which have been presented to me by both experts which occurred after the assessing date, it is appropriate to note that, in considering post-assessing date data, the sales price could be adjusted back to the assessing date just as pre-existing date data can be adjusted forward to the assessing date. However, use of subsequent events has generally been utilized to corroborate an opinion arrived at based on facts known of as of the assessing date. Fort Lee Bor. v. Invesco Holding Corp., 3 N.J. Tax 332, 342 (Tax 1981), aff'd in part, rev’d in part on other grounds, 6 N.J. Tax 255 (App.Div.), cert. denied, 94 N.J. 606, 468 A.2d 238 (1983). On the other hand, “whether such subsequent events, when offered in conjunction with evidence known or reasonably anticipated as of the assessing date, are used in corroboration or as direct evidence is more theoretical than real.” Stanford Enters, v. City of East Orange, 1 N.J. Tax 317, 324 (Tax 1980). In the present case, I am using certain post-assessing date data because such data is of assistance in ultimately determining what the fair market value of the subject properties is.
Plaintiffs sale number two involved a purchase by the Claridge at Park Place, operating the Claridge Casino Hotel, of a property containing 29,120 square feet. The deed is dated January 5,1995, and the property was purchased to expand the Claridge parking garage. There was located on the property at the time of the purchase the Mt. Royal Motel which was demolished, indicating the purchase was for the ground only.
Plaintiffs sale number three involved an assemblage for the Sand’s Casino Hotel garage on South Kentucky Avenue. In using this sale, plaintiffs appraiser used January 1, 1986 as the deed date, what he considered the mid-point of the sales and the assemblage which he used. The total lot size for the sales used in this instance was 22,600 square feet.
*366 This assemblage involved she transactions. Three of the sales involved allocated prices for other land as all, or part, of the transaction. They were not included in the aggregate sales price used by the appraiser in valuing the subject property. These three transactions are as follows:
Deed Date Price per Square Foot
February 14, 1986 $183.00
February 14, 1986 $222.00
February 14, 1986 $ 95.00.
The three sales which were used are set forth as follows:
Deed Date Size in Square Feet Price Per Square Foot
July 19, 1985 7,500 $ 93.00
May 1,1986 7,549 $251.00
May 1,1986 7,549 $252.00.
This recitation of the six transactions, noting that three of them were not used for valuation purposes in this case, indicates how difficult it is to analyze the market in Atlantic City and to value real property. The three sales which were used all involved approximately the same size lots, yet the price per square foot varied from $93.00 to $252.00, within a relatively short period of time.
The other three sales involving allocations with other properties involved different sized lots, varying from 8,999 square feet to 18,073 square feet. Although all of these sales occurred on the same date, once again, the price per square foot as allocated by the buyer and seller varied from a low of $95.00 to a high of $222.00 per square foot.
There are obviously market factors in Atlantic City which differentiate the real estate market from other municipalities and which make it difficult to analyze sales, given the wide variance in prices per unit.
Plaintiffs sale number four involved the expansion of Trump Plaza Casino Hotel into the Trump Regency Hotel and beyond. *367 There were twelve sales involved, occurring between September 1995 and April 1996. One sale occurred on July 9,1997, for a total of thirteen sales. The aggregate land area is 17,470 square feet. Once again the appraiser used a mid-time date, this time of January 1,1996. The price per square foot of the aggregate area was $207.47, including demolition. The lots were essentially the same size, and yet within the relatively short time period indicated, the price per square foot varied from a low of $100.23 to a high $308.33 per square foot. This once again indicates the difficulty in valuing property in Atlantic City used for casino hotel purposes.
The appraiser made few adjustments in arriving at his opinion of the indicated price per square foot for the subject of $225.00. He adjusted sales one, two, and four for 10% and sale three for 20% for location. However, I am satisfied that, since all of the properties are in the RSC zone, the same as the subject properties, and all were related to casino hotels for assemblage purposes, no location adjustment is necessary. The appraiser also made, what he called a “block length” adjustment, as an additional adjustment. He explained that, in his opinion, RSC zone land at the western end of the city is more valuable per unit than RSC zone land in other parts of the city because the western blocks in the zone are shorter, assemblage is more difficult within the zone and “cheaper” land is available across Pacific Avenue. I am also satisfied that this adjustment is not necessary in the case given the sizes of the subject properties and the sizes of the comparables, all relatively small in area. He also adjusted for the age of sale three, indicating that it was his opinion that, based on his analysis of sales over a period of years in Atlantic City since the inception of casino gambling, there had been a fall off in land values from 1986 to 1995. He also made a negative adjustment of 5% for time for sale number four. I accept the 10% negative adjustment to sale number three, but I reject the 5% negative time adjustment for sale number four because of the close proximity in time of sale number four to the assessing date.
In valuing lot 19, the taxpayer’s appraiser used five sales. The sales will be designated as comparables one, three, four, five, and *368 six for ease of reference, because, during the trial, the appraiser withdrew his sale number two as a comparable and asked that, although it is in his appraisal, it not be considered for valuation purposes in this case.
Defendant’s sale number three involved a December 20, 1994 conveyance from Chrysler First Business Credit Corporation to Bally’s Park Place, Inc. The sale price reflected a per square foot price of $54.86. The land was subsequently developed into the Bally’s Park Place Casino Hotel. However, notwithstanding the conveyance of the property to a casino hotel, it is a sale which may not be used as indicative of the value of ground to be developed for casino hotel use. Although the property is in close proximity to Bally’s Park Place, the seller did not recognize the potential value of the property for casino-hotel development purposes. Bally purchased the property by way of an agreement of sale involving a straw purchaser. This fact and the fact that this was property obtained by the seller through foreclosure vitiate its worth as a sale in the sales comparison approach. The property had been vacant for some time, and First Chrysler is not in the real estate business. It is in the business of loaning money. The comments of Judge Crabtree in Harrison Realty Corp. v. Town of Harrison, 16 N.J.Tax 375 (Tax 1997), are applicable here.
Also, the property was vacant for two years, a fact which undoubtedly imparted a sense of urgency to the former owner’s desire to unload the property. While Hartz [the former owner] has the well deserved reputation of being the most successful commercial real estate developer in New Jersey, it also has the reputation of cutting its losses. That appears to be the case here. As defendant’s expert observed in response to one of the court’s questions, some transactions are more influenced by business decisions than by real estate decisions.
[/d at 382.]
Defendant’s sale number one involved Block 2, lot 19.01, located at Massachusetts Avenue and the Boardwalk. Title to the property was transferred on March 20, 1995 from the Federal Deposit Insurance Corporation (the FDIC) for $528,000.00, or $6.60 per square foot. The fact that the grantor was the FDIC casts doubt on the comparability of the sale in valuing other property in Atlantic City. This sale is also in the inlet section of the city, having no significant commercial development at the time *369 of the sale, and significantly east of the Showboat Casino Hotel, the most easterly casino-hotel on the Boardwalk.
Defendant’s sales four, five, and six all involve the purchase of properties which were subsequently used for parking. Sale number four involved the purchase of two adjoining tracts, one tract purchased on December 28,1993 and the other tract purchased on June 3, 1994. The total acquisition cost for both tracts was $641,948.00, including actual demolition costs and payments for option extensions. The demolition costs resulted from the demolition of a three-story hotel on one of the lots. According to defendant’s appraisal, marked in evidence, “[t]his assembled site has been blacktop paved, striped and fenced for use as a surface parking lot.” The lot on which a the three-story hotel was demolished was among several non-performing properties acquired by the grantor from National Westminster Bank in August 1993.
Defendant’s sale number five involved a property on Pennsylvania Avenue used as a surface parking lot. Prior to its sale, the property had been leased to Resorts International Hotel, Inc., a casino hotel, for surface parking. Resorts had a right of first refusal which it declined to exercise, indicating that, in spite of its proximity to a casino-hotel, its use by a casino hotel was not efficient. The subject sale also involved a grantor which was a successor to a former mortgagee.
Defendant’s sale number six involved a property which, according to defendant’s appraiser, involved a parking lot as an “interim use .” This property is located on the corner of North Carolina and Pacific Avenues and was sold on September 14, 1993. The property was acquired by the owner of the adjoining properties which had inadequate parking area for their guests.
Defendant’s appraiser appraised lots 17, 20, and 21 separately from lot 19. He also originally used six sales to value these lots. At the time of the trial, he again excluded sale number two as a comparable sale. Accordingly, he used five sales which he said were comparable for purposes of valuing lots 17, 20, and 21. I *370 shall refer to the sales with the same designations which the appraiser used.
Defendant’s sale number one for this appraisal involved a property oh South Kentucky Avenue. The purchaser owned adjacent parcels on both sides of the subject property. In effect, by owning parcels on both sides of the subject property, the purchaser effectively controlled the disposition of the subject property, and the grantor was, in a word, “stuck.”
Defendant’s sale number three involved the purchase of a property on the ■ south side of Dr. Martin Luther King, Jr. Boulevard, formerly Illinois Avenue, by Greate Bay Hotel and Casino, Inc., the operator of the Sand’s Casino Hotel. This property was acquired by the purchaser to provide more convenient access to its adjacent self-parking garage. The property was being operated as a parking lot at the time of the sale, and the evidence before me indicates that this addition to the Sand’s parking complex was not necessary, but was more a matter of convenience. This observation is critical when considering that plaintiff’s sale number three involved the purchase of lots used to enlarge the Sand’s parking garage at a time when additional parking was an absolute necessity for the Sand’s in order for it to compete effectively in the casino market.
Defendant’s sales four, five, and six, used by the appraiser to value lot 17, 20, and 21 were the same sales as sales four, five, and six used by the appraiser to value lot 19.
Of the five sales used to value lot 19 by defendant’s appraiser, I reject sales one and three as completely inapplicable to the valuation of that lot. Similarly, I reject sales one and three of the five lots used to value lot 17,20, and 21 as inapplicable to the value of those three lots. Remaining in the valuation of all of the lots by defendant’s appraiser are sales four, five, and six, the same in both appraisals.
To the extent that defendant’s appraiser has valued the properties as two separate tracts, or two separate economic units, from his testimony and from reading his appraisals I conclude *371 that, in any event, he relied primarily on sales four, five, and six in both instances. Yet those sales involve properties with a different highest and best use, namely surface parking or interim use as surface parking. They do not involve the same highest and best use as the subject properties. In addition, these sales four, five, and six involve a use which is essentially the interim use which defendant’s appraiser concludes is the interim use for the subject properties, not the highest and best use.
It should also be noted that in valuing lot 19 by the sales comparison approach, the defendant’s appraiser rejected the income capitalization approach as a method for valuing the subject property. In his appraisal of lot 19, marked in evidence he said:
The net income stream which this property is capable of producing, as improved, would not serve as the basis for an investment/purchase decision by a knowledgeable buyer for this type of property. A knowledgeable buyer aware of the tenuous quality and durability of the property’s net income stream would place limited reliance on it as a value indicator.
In his appraisal of lots 17, 20, and 21, defendant’s appraiser has similar language:
The net income stream which this property is capable of producing, as an interim pay parking lot, would not serve as the basis for an investment/purchase decision by a knowledgeable buyer for this type of property. A knowledgeable buyer aware of the tenuous quality and durability of the property’s net income stream would place limited reliance on it as a value indicator.
The appraiser then went on to say, in both appraisals, that he did not use the income capitalization approach in valuing the subject properties. As already indicated, defendant’s appraiser’s own analysis on this point effectively vitiates his own conclusions of highest and best use and interim use.
The value of the subject properties was dramatically indicated by a witness presented by the city. He was Wallace R. Barr, the President of Hilton and the operator of that casino-hotel which is adjacent to the subject properties across Sovereign Avenue. He described the nature of the expansion of the hotel from its location on Boston Avenue, one block west of Sovereign Avenue, onto the block between Boston and Sovereign Avenues, which is adjacent to the defendant’s property, across Sovereign Avenue. The most telling part of his testimony was his descrip *372 tion of a meeting, at Ms invitation, with defendant, Frances Ginnetti, and her daughter, in his office in the Hilton in February 1996. He offered to purchase the subject lots, and the small lot designated as lot 21, for $6,000,000.00. His offer was rejected by defendant. When he was askéd on cross-examination by defendant’s counsel of the terms involved in the offer, he said that he and defendant never discussed terms because of defendant’s outright rejection of Ms offer. He indicated as well that defendant had an asking price, at that time, of $8,000,000.00 for the subject properties.
While it is true that Mr. Barr’s offer to purchase is not a sale to indicate the value of the subject properties, Ms testimony was credible. It is important. It impacts on my determination that the city’s appraiser is essentially correct in Ms opmion of the value of the subject property.
Essential to understanding the importance of Mr. Barr’s offer was Ms clear and convincing testimony concerning the nature of the infrastructure in Atlantic City; the problems that the infrastructure presents to casino hotel development; and the result, due to the infrastructure, that casino-hotels in Atlantic City are essentially “landlocked” and must expand in accordance with the layouts of the streets in order to increase their amenities, their casino space, their hotel rooms, and the other areas' of their properties in order to remain competitive. He further indicated that he had concluded that the Hilton should expand eastwardly towards defendant’s property and not westwardly on the other side of the hotel-casino building.
There is much validity to Mr. Barr’s testimony. It coincides with the very conclusions of the city’s zoning ordinance, referred to above, in dealing with limited land resources and infrastructure capacity.
At tMs point, it should be noted that defendant’s appraiser indicated the possible uses of the Pacific Avenue lots for retail purposes and the use of the Boardwalk lot for parking and retail stores along the Boardwalk frontage. There was also testimony *373 from him concerning plans by defendant to develop lot 19, the Boardwalk lot.
Although defendant was in the courtroom during the entire trial, she did not testify to corroborate her appraiser’s comments on potential development, to dispute Mr. Barr’s testimony nor to explain her reasons for rejecting Mr. Barr’s offer of $6,000,000.00 to purchase the property and her counter-demand for $8,000,000.00 as her asking price.
If in fact there were appropriate development plans which could show a different highest and best use than that posited by defendant’s appraiser or if there were legitimate reasons for rejecting the $6,000,000.00 offer, the person who was best able to testify on these subjects was defendant. Her failure to testify justifies my drawing the adverse inference that she would not support the testimony of her own expert, that she could not refute the testimony of Mr. Barr and that she could not explain in any rational way why she rejected an offer for $6,000,000.00 for property valued at a total of $1,245,675.00 by her appraiser. “The rule permitting adverse inferences to be drawn from the failure of a party to produce a witness raises a natural inference that the failing party fears exposure of those facts which would be unfavorable to him or her.” Maul v. Kirkman, 270 N.J.Super. 596, 610, 637 A.2d 928 (App.Div.1994). In the instance where a party fails to testify, there is a “more persuasive reason for drawing an inference____” Id. at 610, 637 A.2d 928.
In countering the effect of Mr. Barr’s testimony, counsel for defendant urges me to conclude that a “Chinese Wall” exists along Sovereign Avenue between the Boardwalk and Pacific Avenue, effectively blocking development of the Hilton in an easterly direction across Sovereign Avenue to encompass defendant’s properties. The argument is based on a “Declaration of Covenants and Restrictions”, made on June 6, 1996 by Bally’s Park Place, Inc., and recorded in the Office of the Clerk of Atlantic County.
The declarant owned the block bounded by Boston, Sovereign, and Pacific Avenues and the Boardwalk on which the Hilton built *374 a substantial expansion and a hotel rooms tower. The declarant is a related corporation to the owner of the Hilton. The document provides for compliance with certain requirements of the New Jersey Department of Environmental Protection (D.E.P.) pursuant to the Coastal Area Facilities Redevelopment Act. The declaration provides for a park on the declarant’s property at the southwest corner of Sovereign and Pacific Avenues. The declaration also provides that the declarant will maintain a landscaped area along Sovereign Avenue between the Boardwalk and the park on the corner of Pacific Avenue. The declaration was entered into as a result of the development of the block bordered by the Boardwalk, Sovereign Avenue, Pacific Avenue, and Boston Avenue, which development substantially expanded the Hilton Casino Hotel to the east.
Defendant argues that this declaration effectively bars further development of the Hilton in an easterly direction. The argument is misplaced and is rejected. The declaration contains in it a provision which reads, “This declaration may not be modified, amended or discharged without the written consent of N.J.D.E.P. or its successor in interest.” Such a provision clearly contemplates that the declaration may be modified, amended or discharged with the written consent of the D.E.P. In the interest of developing the casino industry in Atlantic City, the D.E.P. would be amenable to a modification, amendment or discharge of the declaration in order to permit the eastwardly expansion of the Hilton. This is so because, by virtue of the ownership of a substantial amount of other land in the immediate vicinity of its own property and of defendant’s property, the Hilton could mitigate the provisions of the declaration and substitute substantial property for the park and for landscape use to benefit the public in the area of defendant’s property. There is ample evidence in the record to support such a determination.
The city’s appraisal contains in it charts showing the appraiser’s sales and his adjustments. They may be summarized as follows:
*375 Sale 12 3 4
Unit Sales Price $154 $262 $199 $207
Adjusted $200 $340 $251 $237.
Based on the adjustments accepted or rejected by me the following square foot values are indicated:
Sale 12 3 4
Adjusted $154 $262 $179 $207.
Appraising real property, certainly for local property tax purposes, is as much an art an it is a science, perhaps even more an art than a science. It involves the experience of the appraiser and the appraiser’s judgment and opinion. Notwithstanding careful analysis of market data, exact precision is not always obtainable. Experts, however, attempt precision. For example, in the present case, the parties have stipulated that the square footage of the subject property, including lot 21, is 38,513 square feet. In addition, exact prices evidenced by deeds are used in the valuation process, notwithstanding the imprecision of the reconciliation process by which the appraiser takes his data, in this case the comparable sales data, and comes up with his final opinion of value.
Accordingly, when precision is attempted, the appraiser should make every effort to check the data as closely as possible. These comments are made with regard to the adjusted prices per square foot used by plaintiffs expert. The sales prices used by plaintiffs expert with regard to sales one, two, and four are impacted by demolition costs. For example, plaintiffs sales price per square foot is first given as $152.19 for sale number one. The expert then goes on to say that the sales price per square foot, including demolition, is $153.57. With regard to this sale number one, the appraiser indicates that, “demolition estimated at $30,000.” Demolition costs are therefore $1.38 per square foot. In sale number two, the appraiser indicates, “Demolition permit indicates $625,-000 .” This is $21.47 per square foot. For sale number four, the *376 appraiser indicates, “Demolition by grantee at reported cost (Demolition Permits) of $149,000.” This is $8.53 per square foot.
While demolition costs may vary greatly from one property to another, depending on the size and nature of the improvements to be demolished, the significant disparity among the demolition costs in these three sales used by plaintiffs’ expert require a more careful analysis than that demolition be “estimated” or that the “demolition permits” indicate a certain amount of money. In this instance, I am not satisfied with either the estimate or the demolition permit figures. Accordingly, I have further adjusted the plaintiffs sales price per square foot to exclude demolition costs as follows:
Sale 12 3 4
Adjusted $152 $240 $179 $198.
In this instance, the adjusted prices at the lower range of the adjusted prices per square foot are indicators of the value of the subject property. While there are positive influences on the indicated values per square foot of the subject property, there is one slight negative influence when the subject property is compared to the four sales which have been used from plaintiffs testimony and appraisal. Positive influences are the relatively small size of the property and that, within a very short time after the assessing date, the hotel-casino bordering defendant’s property to the west, offered to purchase defendant’s properties for $6,000,000. While it is true that the offer was rejected, the fact of the offer must have some influence on my determination of the value of the subject property. No doubt this fact was unknown to the assessor valuing the property as of October 1,1995. However, it justifies the assessor’s view of the market on the assessing date and the appraiser’s opinion that the subject property should be valued for assemblage purposes with regard to casino hotel use. The negative factor is the existence of the declaration relating to the park and the landscaping along Sovereign Avenue. Under all of these circumstances, I conclude that $160 is the indicated price per square foot for the subject properties, and their value, togeth *377 er with lot 21, as of October 1, 1995 is $6,162,080 ($160 x 38,513 square feet).
The value having been determined, the assessment must be determined by application of Chapter 123. Chapter 123 is the shorthand name for N.J.S.A. 54:51A-6 which provides that, if the ratio of the assessed value of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, judgment shall be entered revising the taxable value of the property by applying the average ratio to the true value of the property.
The Chapter 123 ratio for 1996 for Atlantic City was determined by the Director, Division of Taxation, as 94.45%. The lower limit of the common level range is 80.28%. The upper limit of the common level range is 108.62%, or 100%. See Caulfield v. Surf City Bor., 14 N.J.Tax 118 (Tax 1994).
When considering the issue of discrimination, I must use the original assessment in applying the Chapter 123 Ratio. Rumson Bor. v. Haran, 3 N.J.Tax 590 (Tax 1981). See also, Shav Associates v. Middletown Tp., 11 N.J.Tax 569, 577 (Tax 1991), citing Rumson Bor. v. Beckham, 7 N.J.Tax 539, 553 (Tax 1985); Ewing Township v. Suburban Square Assocs., 7 N.J.Tax 263, 274 (Tax 1985); Briskin v. City of Atlantic City, 6 N.J.Tax 187, 194 (Tax 1983); and Jefferson House Investment Co. v. Chatham, 4 N.J.Tax 669, 680 (Tax 1982).
The ratio of the assessed valuation of the subject properties to its true value is 100.38% ($6,186,100 + $6,162,080), above the upper limit of the common level range. Accordingly, the assessments of the subject properties and lot 21 for the tax year 1996 is fixed at an aggregate of $5,820,084 ($6,162,080 x 94.45%).
Using the principle set forth in Mobil Oil Corp. v. Greenwich Tp., supra, the assessments are calculated as follows:
Aggregate assessment for the 4 lots $5,820,084
Less the assessment for lot 21 1,000
Aggregate assessment for the 3 subject lots $5,819,084 or $5,819,100.
*378 For administrative purposes, the aggregate assessment will be allocated among the three lots in the same proportion as the original assessments. Judgments will be entered fixing the assessments of the subject properties for the tax year 1996 as follows (all figures are rounded):
Docket No. 9185-96, lot 19
Land $3,735,000
Improvements 14,600
Total $3,749,600;
Docket No. 9180-96, lot 17
Land Improvements $1,460,600 6,400
Total $1,467,000; and
Docket No. 9183-96, lot 20
Land $ 599,800
Improvements 2,700
Total $ 602,500.