SMALL, P.J.T.C.
Each year three ratios establishing the relationship between fair market value and assessed value for tax purposes are promulgated for each of New Jersey’s 566 municipalities. The first, the school aid ratio, is promulgated on October 1 of the pretax year by the *5 Director of the New Jersey Division of Taxation (the “Director”). N.J.S.A. 54:1-35.1. The second ratio, the chapter 123 ratio, is based on the school aid ratio and is promulgated on or before April 1 of the tax year. N.J.S.A 54:l-35b (L. 1973, c. 123). The final ratio, the county equalization ratio, is also based on the school aid ratio and is initially promulgated on March 10 by each of the 21 county boards of taxation. N.J.S.A. 54:3-18.
For the tax year 2007, Atlantic City has challenged all three ratios based on the same theory-that it was error for the Director and the Atlantic County Board of Taxation to exclude from her and its calculations the sales prices and tax assessments of two parcels of real estate on which the former Traymore Hotel in Atlantic City had been located (the “Traymore sites”). Inclusion of those sales in the calculations would have increased Atlantic City’s school aid, county equalization, and chapter 123 ratios from 44.42% to 61.19%.
In a case decided on February 28, 2007, City of Atlantic City v. Director, Div. of Taxation, Docket No. 000145-2007, and recently affirmed by the Appellate Division, City of Atlantic City v. Director, Div. of Taxation, Docket No. A-3700-06T3, 2008 WL 90013 (Jan. 9, 2008), this court found that the challenge to the school aid ratio could not be heard because it was filed too late.
In this opinion, I find that the challenge to the chapter 123 ratio may not, as a matter of law, be brought separately from a challenge to the school aid ratio (previously dismissed as having-been brought too late) or independently from the appeal of a specific tax assessment. With regard to the challenge to the 2007 Atlantic County Equalization Table, I find that the exclusion of the sale of the two Traymore sites from the calculation of the ratio was correct. Implicitly, I therefore find that even had the school aid ratio challenge been timely, or if this court had jurisdiction to hear a challenge to the chapter 123 ratio, Atlantic City could not have prevailed as a matter of law on the facts as I have found them after a tidal.
The Atlantic County Board of Taxation formally adopted the school aid ratios as its county equalization ratios on April 5, 2007. *6 Atlantic City appealed the promulgation of the chapter 123 table on or about April 18, 2007, and appealed the county equalization table first on April 23, 2007, and as amended on May 14, 2007. This court consolidated these two matters on July 18, 2007, and heard testimony on December 19, 2007. Counsel submitted post-trial and reply briefs on January 11 and 25, 2008, respectively.
Atlantic City asserts that the Traymore sites should have been used in calculating Atlantic City’s chapter 123 and county equalization ratios for 2007. The Director and the Atlantic County Board of Taxation, both represented by the Attorney General, defend the exclusion of the sale of the Traymore sites from calculation of the two ratios on the grounds that the sales of the two properties were not at reliable arms-length market prices, and that as to the chapter 123 ratio this court has no jurisdiction to hear the appeal. For the reasons explained below, I find that the defendants’ position is correct and judgments will be entered dismissing Atlantic City’s challenges to the two tables. As a matter of fact and law I find that it was correct to exclude the sale of the Traymore sites from the 2007 chapter 123 table and Atlantic County Equalization Table. Additionally, I find that this court lacks jurisdiction to hear the appeal of the chapter 123 ratio in this case.
I.
American Real Estate Partners, LP (“AREP”), now known as Icahn Enterprises, LP (“Icahn Enterprises”),[2] and related subsidiary entities, entered into an asset purchase agreement (the “agreement”) on November 28, 2005, to purchase the Traymore sites, which are adjacent to AREP’s Sands Hotel and Casino (“Sands”) in Atlantic City. As part of that same agreement another AREP-related entity agreed to purchase the Flamingo-Laughlin Hotel and Casino in Nevada (“Flamingo-Laughlin site”). The sellers were all entities controlled by and related to Harrah’s Operating Company, Inc. (“Harrah’s”).
*7 The purchase price of the Flamingo-Laughlin and two Tray-more sites was a total $170 million. Subsequently, $109 million was allocated to the Flamingo-Laughlin site and the $61 million residual to the Traymore sites. That $61 million was further allocated among the two Traymore sites ($58.5 million for the larger parcel, and $2.5 million for the smaller parcel). None of these allocations were a part of the agreement and the allocations were determined after the total price for the three parcels had been agreed to. It should be noted that the purchase of the Flamingo-Laughlin site included assets in addition to real estate.
At trial, Ms. Lynn Hughes, vice-president of legal affairs for Harrah’s Entertainment, Inc., the selling entity, testified as follows. Harrah’s acquired Caesars Entertainment in June 2005, and through that purchase, acquired the Traymore sites. During its ownership of the Traymore sites, Harrah’s did not advertise them for sale, nor retain a broker to market the sites on its behalf. This was eustomary practice, as Harrah’s never listed any property in the RS-C Zone (hotels and casino-hotels are permitted uses in Atlantic City’s RS-C Zone) for sale with a broker. Ms. Hughes testified that Harrah’s was knowledgeable of the sites’ value. Harrah’s received an offer to purchase the Traymore sites from the Mitre Group for $35 million, which Harrah’s rejected because it had an initial asking price of $70 million. Although she could not say that properties in this area were typically listed with a broker, Ms. Hughes stated the Mitre Group did act through a broker. Harrah’s was also unable to determine who the Mitre Group was and whether it was a legitimate purchaser.
Thereafter, she testified that an unidentified representative from AREP contacted Harrah’s about purchasing the Traymore sites. Although AREP’s first contact concerned only the purchase of the Traymore sites, such purchase became part of a larger transaction with the sale of the Flamingo-Laughlin site in Nevada. The total consideration paid for the Flamingo-Laughlin and the Traymore sites was $170 million, which Ms. Hughes testified was negotiated between a willing buyer and willing seller. The allocation of the total purchase price was determined either at the time of closing or just before (not at the time the total price for the *8 three properties was agreed to). To the best of Ms. Hughes’ knowledge, no appraisals were done for either of the Traymore sites. The sale of the Flamingo-Laughlin site was contingent on the sale of the Traymore sites.
After Ms. Hughes’ testimony, the deposition of Ms. Felicia Buebel, deputy counsel of AREP, the purchaser, was entered into evidence and examined. In her deposition, Ms. Buebel stated that AREP was in the business of purchasing properties, and was not compelled to purchase the Traymore sites. She reiterated that the total purchase price of the Flamingo-Laughlin and Traymore sites was negotiated for $170 million. The price was allocated shortly before closing (but after the total price had been agreed to), and based upon an appraisal done only on the FlamingoLaughlin site. The Flamingo-Laughlin site was appraised at and had allocated to it $109 million, and the residual $61 million was allocated to the Traymore sites (although the Nevada Declaration of Value Form states $105,615,000-leading the court to conclude that the $109 million figure included more than real estate). Ms. Buebel stated in her deposition that the purchase of the Traymore sites would make Sands’ adjacent property more valuable.
Thereafter, Ms. Karen Ringold, a deputy tax assessor of Atlantic City, testified as follows. Ms. Ringold received the deeds to the Traymore sites on or about May 26, 2006, and recorded the parcels as non-usable for purposes of calculating the Director’s school aid ratios, not on the open market (NU-26) on form SR1-A[3] under N.J.A.C. 18:12-1.1(a). At that time, Ms. Ringold did not perform a full investigation to determine the usability of the sale of the Traymore sites. She was not aware that the Traymore sites were part of a larger transaction with the Flamingo-Laughlin site. Based on her limited research, Ms. Ringold marked the sale of the Traymore sites non-useable because the parcels were not listed with a broker and thus not on the open market, appeared to be purchased as an assemblage, and there were no “for sale” signs posted on the vacant lots. On review, Ms. Ringold *9 determined that she would have classified the sale as a market sale because it became her understanding that property located in the RS-C Zone, such as the Traymore sites, is not usually listed with brokers. She also testified that the stated sale prices for the Traymore sites were consistent (on a dollar-per-square-foot basis) with the price of other properties in the area.
Ms. Sue Davison, the Director’s supervising field representative, then testified regarding the procedure for developing the Director’s school aid and chapter 123 tables. She explained that a usable sale is defined as an open market, arms-length transaction between a willing buyer and willing seller in which the sales price is paid in cash, the entire bundle of rights is transferred, and the characteristics of property assessed and sold are as similar as possible. She testified that the Director does not rely upon the determination (as to whether a sale is usable or not) made by the assessor’s office, but that the Director’s evaluators and field staff conduct their own review to determine the usability of each sale. When she learned that Atlantic City was appealing its chapter 123 and county equalization ratios, Ms. Davison directed a field representative, Mr. Thomas Derrieo, to investigate the sale.
Mr. Derrieo testified as follows. He began his investigation by reviewing the subject deeds, tax map, tax list, and Form SR1-A. He also talked to witnesses and conducted Internet research. Results of his investigation revealed that Sands (through AREP), the adjacent property owner, purchased the Traymore sites because they increased the value of Sands’ property by granting it ownership of all property from Pacific Avenue to the boardwalk. This fact led Mr. Derrieo to classify the property as a non-usable assemblage (NU-26) under N.J.A.C. 18:12-1.1(a).
During his investigation, Mr. Derrieo determined that of the total $170 million purchase price for both sites, $109 million had been allocated to the Flamingo-Laughlin site in accordance with its appraisal and the residual $61 million to the two Traymore sites. Because the Traymore sites’ allocation lacked a basis other than as the residual value, the sites were also classified non-usable as part of a package deal with an arbitrary allocation (NU-30) *10 under N.J.A.C. 18:12-l.l(a). Mr. Derrieo noted that he does not typically study the per-square-foot value of surrounding properties in Atlantic City in determining market value, and thus he did not investigate that value in conducting his investigation.
Ms. Davison then testified to her investigation into the purchase of the Flamingo-Laughlin and Traymore sites as follows. When investigating whether a property qualifies as an assemblage, she investigates whether the acquisition of properties by an adjacent property owner is made for either an expansion of property or to prevent competition. After reviewing the tax map, it appeared that Sands (an AREP-related entity) owned most of Block 47 and acquired the rest through the purchase of the Traymore sites. She testified that purchase of the Traymore sites gave Sands full access to the property from Pacific Avenue to the boardwalk, which almost every casino bordering the boardwalk has. Accordingly, she classified the sale of the Traymore sites as non-usable as an assemblage (NU-26).
She further testified that the Traymore sites were also classified non-usable (NU-30) because they were purchased as part of a package deal with the Flamingo-Laughlin site, and investigation into the sale revealed no basis for allocating $61 million of the total $170 million purchase price to the Traymore sites, other than as a residual value. Her investigation also revealed no basis for allocating the $61 million between the Traymore sites ($2.5 million to Block 48, Lot 25 and a portion of Block 1, Lot 11, and $58.5 million to Block 47, Lots 13-18, Block 48, Lots 11-14 and 19, and Block 49, Lot 12).
During her investigation, Ms. Davison did not review price per square foot for property in the RS-C Zone, nor did she analyze whether price paid for the Traymore sites reflected fair market value. Ms. Davison accepted the value on the subject deeds to calculate the realty transfer fees, and did no independent investigation on AREP or its business. She noted that even if the Director had an “unassailable perfect appraiser” to certify that the two parcels were worth $61 million, she would not change her opinion. She testified that the subject sale was non-usable be *11 cause although it may in fact reflect market price, the transaction which led to the sale was not reliable as a market sale because: (a) the price was determined as the residual of an appraisal value for another parcel and a total price negotiated for these three parcels, (b) the Traymore parcels were acquired as part of an assemblage, and (c) there was an allocation of sales price between the two Traymore parcels with no basis in the record.
II.
The Director argues that Atlantic City’s complaint should be dismissed because it has failed to meet its burden of proving that the sale of the Traymore sites was a “usable sale” for purposes of calculating the chapter 123 and county equalization tables. Atlantic City asserts that the sale of the Traymore sites is usable because the sale was for a fair market value between a willing buyer and willing seller, transacted “on the open market similar to such properties located in the unique RS-C Zone in the City of Atlantic City,” and because the sales price was not the product of a package deal with an arbitrary allocation but rather the result of an arms-length negotiation between the buyer and seller. The facts lead me to find in favor of the Director’s determination to exclude the sale of the Traymore sites from the calculations of the school aid, chapter 123, and county equalization ratios.
Challenges to the Director’s October 1 school aid and subsequent April 1 chapter 123 tables are reviewed under a standard different from challenges to a county equalization table. Borough of Fort Lee v. Director, Div. of Taxation, 12 N.J.Tax 299, 309-13 (Tax 1992), aff'd, 13 N.J.Tax 323 (App.Div.), certif. denied, 134 N.J. 563, 636 A2d 521 (1993). Challenges to the October 1 school aid and April 1 chapter 123 tables “can only be successful if plaintiff can demonstrate that the Director’s action ‘could not reasonably be justified.’ ” Id. at 311 (citing N.J.S.A. 54:51A-4(c)); see also Township of Union v. Director, Div. of Taxation, 176 N.J. Super. 239, 1 N.J.Tax 15, 17, 422 A.2d 803 (Tax 1980) (citing Town of Kearny v. Division of Tax Appeals, 35 N.J. 299, 304, 173 A.2d 8 (1961) (“[a] municipality seeking the inclusion of a sale omitted by the Director in his study bears a heavy burden of proof *12 because the Director is vested with wide discretion in fashioning the annual table.”)). This “statutorily required standard of proof ... make(s] it clear that those ratios are reasonably justified unless they lead to some not insignificant misallocation of school aid.” Fort Lee, supra, 12 N.J.Tax at 313.
However, challenges to the county equalization table are “different and more easily met.” Ibid. These challenges must prove such ratios are “arbitrary, capricious or unreasonable.” Township of Washington v. Warren County Tax Administrator, 19 N.J.Tax 1, 7 (Tax 2000) (citing Township of Woodbridge v. Middlesex County Bd. of Taxation, 96 N.J.Super. 532, 537, 233 A.2d 650 (App.Div.1967)). See also Township of Berkeley Heights v. Division of Tax Appeals, 68 N.J.Super. 364, 172 A.2d 453 (App.Div.), cetif. denied, 36 N.J. 138, 174 A.2d 923 (1961) (in which the court sustained the county board’s equalization table in the absence of proof that the board’s action was arbitrary and unreasonable.)
The primary question in this case is whether the Director erred in excluding the sale of the Traymore sites in the calculation of her ratios on the grounds that the sale was properly classified as one of her thirty-three categories of non-usable deed transactions. Cf. Union, supra, 176 N.J.Super. 239, 1 N.J.Tax at 18, 422 A.2d 803. N.J.A.C. 18:12-1.1(a) provides that the following categories of deed transactions are not usable in determining assessment-sales ratios pursuant to N.J.S.A. 54:1-35.1, et seq.:
26. Sales which for some reason other than specified in the enumerated categories are not deemed to be a transaction between a willing buyer, not compelled to buy, and a willing seller, not compelled to sell;
30. Sale in which several parcels are conveyed as a package deal with an arbitrary allocation of the sale price of each parcel.
[N.J.A.C. 18:12—1.1(a).]
There is an exception to non-usable sales provided by N.J.AC. 18:12—1.1(b):
Transfers falling within the foregoing category numbers 1, 2, 3, 9,10,13,15,17, 26, 28 and 31 (under (a) above), should generally be excluded but may be used if after full investigation it dearly appears that the transaction was a sale between a willing buyer, not compelled to buy, and a willing seller, not compelled to sell, with all conditions requisite to a fair sale with the buyer and seller acting knowledgeably *13 and for their own self-interests, and that the transaction meets all other requisites of a usable sale.
[N.J.A.C. 18:12—1.1(b) (emphasis added).]
Atlantic City asserts that N.J.A.C. 18:12-1.1(b), coupled with the holdings in Borough of Englewood Cliffs v. Director, Div. of Taxation, 18 N.J.Tax 662, 669 (App.Div.2000), and 1530 Owners Corp. v. Borough of Fort Lee, 135 N.J. 394, 399, 640 A.2d 811 (1994), support the proposition that the test for the usability of a deed transaction is not whether the sale is unusable because it merely fits into one of the Director’s thirty-three enumerated categories of non-usable sales, but whether the sale was an arms-length transaction reflective of the fair market value of the underlying property.
In Englewood Cliffs, supra, the Appellate Division noted that the non-usable “categories set forth in N.J.A.C. 18:12-1.1 are primarily designed to identify ‘sales that are unlikely to have involved arms-length bargaining and therefore are unlikely to have been made at fair market value.’ ” 18 N.J.Tax at 669. The Appellate Division further explained that “category twenty-six applies only to sales that ‘are not deemed to be transactions between a willing buyer, not compelled to buy and a willing seller, not compelled to sell.’” Id. at 670 (quoting N.J.A.C. 18:12-l.l(a)(26)). In 1530 Owners Corp., supra, our Supreme Court noted that while the “standards applied in determining usability are reflected in N.J.A.C. 18:12-1.1 ... [generally, sales are usable if they constitute an arms-length transaction that reflects the market value of the property.” 135 N.J. at 398, 640 A 2d 811. Addressing the burden of proof to exclude a sale from the Director’s tables, that Court specified that “because assessments are presumed valid, a taxpayer’s burden is not met until it proves that |an] investigation would have led to the Director’s exclusion of the sale---- [E]ven if the Director used a sale that by Ms regulations is suspect, the taxpayer has the burden of proving that in fact the sale price was [more or] less than market value and that its use by the Director produced an invalid assessment.” Ibid.
*14 Here, however, Atlantic City has failed to produce sufficient, competent evidence that the Director misclassified the sale of the Traymore sites as a non-usable assemblage, part of a package deal with an arbitrary allocation, or to produce evidence that the sale was an arms-length transaction reflective of the fair market value of the underlying property.
A.
The record supports a finding that the sale of the Traymore sites was an assemblage and thus non-usable for purposes of the Director’s school aid and chapter 123 tables. N.J.AC. 18:12—l.l(a)(26) excludes from usable sales “[s]ales which for some reason other than specified in the enumerated categories are not deemed to be a transaction between a willing buyer, not compelled to buy, and a willing seller, not compelled to sell.” New Jersey courts define an assemblage as the cost to acquire “contiguous property owned by others in order to create a single integrated unit.” County of Monmouth v. Hilton, 334 N.J.Super. 582, 584, 760 A.2d 786 (App.Div.2000); see also Appraisal Institute, Appraisal of Real Estate, 230 (12th ed. 2001) (defining assemblage as “an increment of value that results when two or more sites are combined to produce greater utility”).
Assemblages are not considered usable sales for purposes of the Director’s school aid and chapter 123 tables because they add significant value to the adjacent property not reflected in the assessment of the combined tract. Cf. City of Atlantic City v. Boardwalk Regency Corp., 19 N.J.Tax 164, 176 (App.Div.2000) (noting property added as an assemblage in Atlantic City affords “significant boardwalk frontage ... and ... continuity of ownership [which] offers great benefits to the tract overall”); City of Atlantic City v. Ginnetti, 17 N.J.Tax 354, 363 (Tax 1998) (noting that assemblages add value through affording casinos “the opportunity to expand facilities through absorption and development, thereby putting the entire tract to its highest and best use”).
In this case, Atlantic City argues that the sale did not constitute an assemblage because the Traymore sites were purchased by *15 “AREP and the surrounding properties were owned by a separately traded public corporation.” Atlantic City asserts that “[t]here was absolutely no testimony whatsoever regarding the common ownership of these two publicly traded corporations and therefore, this court cannot assume the percentage of common ownership amongst these two publicly traded corporations.”
Atlantic City fails in this argument. The deeds to the Traymore sites and the agreement establish that AREP (now Icahn Enterprises), through its subsidiary AREP Boardwalk, purchased the Traymore sites “eare/of” Sands. In her deposition entered as evidence, Ms. Buebel stated that Sands was a sister affiliate of AREP Boardwalk. She stated that AREP Boardwalk made the initial offer to purchase the Traymore sites. She also stated that AREP acquired other surrounding properties besides the Tray-more sites, and that such acquisitions were made while planning for subsequent redevelopment. She also testified that the assemblage of the sites enhanced the value of AREP’s existing holdings (i.e. Sands).
It is uncontested that, prior to AREP’s purchase of the Tray-more sites, Sands owned most of Block 47. Evidence entered and testimony heard at trial established that the acquisition of the Traymore sites vested complete ownership and control of all of Block 47 in Sands, AREP and other related AREP entities. Those purchases increased the value of the whole of the tract located between Pacific Avenue and the boardwalk as it allowed AREP to both prevent competition on the sites and then increase the value of the whole tract after its redevelopment.
I find such evidence and testimony more persuasive than Atlantic City’s assertion regarding lack of proven common ownership. The record supports a finding that AREP purchased the Tray-more sites as an assemblage because AREP, through its subsidiary AREP Boardwalk, purchased the Traymore sites on behalf of Sands, a related subsidiary of AREP, and such purchase vested in Sands, and thus AREP indirectly, common ownership of the adjacent properties which increased the value of the whole of Block 47. New Jersey case law, as discussed above, leads to the *16 conclusion that such a purchase is an assemblage, which Director correctly determined non-usable under NU-26.
Atlantic City next asserts that, even if the sale was an assemblage, it still qualifies as a market sale, and is thus usable for purposes of the chapter 123 and county equalization tables, because it was a transaction between a willing buyer and willing seller, not compelled to buy nor compelled to sell, and knowledgeable of the sites’ market values. Atlantic City errs in this argument, however, because neither Sands nor Harrah’s negotiated separately for the price of the two Traymore sites vis-a-vis the price of the Flamingo-Laughlin site, and because Sands (AREP indirectly), under the terms of the asset purchase agreement, allocated price between the two Traymore sites on its own, not through any negotiation.
Had there been an appraisal performed to determine the market value of the whole tract, the sale might have been deemed usable for purposes of calculating the Director’s school aid and chapter 123 tables. Cf. Riorano, Inc. v. Township of Weymouth, 4 N.J.Tax 550, 563-64 (Tax 1982) (noting that “problems relating to size and assemblage cost are overcome by using the sales of the entire subject property as was done by the appraiser.”). However, no such appraisal of the Traymore parcels was done, and there was no negotiation with respect to the prices allocated to each of the three parcels transferred by the agreement. The terms of the agreement indicate that the allocations may have been driven by Internal Revenue Code provisions and business advantage rather than by the three sites’ true fair market values.
Because the record supports a finding that the sale of the Traymore sites was an assemblage, and thus not a usable sale, Atlantic City has failed to meet its “heavy burden” to overcome the presumption of the accuracy of its chapter 123 and county equalization ratios.
B.
The record also supports a finding that the sale of the Traymore sites was part of a package deal with an arbitrary *17 allocation of prices between both the Flamingo-Laughlin and the Traymore sites, and an arbitrary allocation between the two Traymore sites. N.J.A.C. 18:12-1.l(a)(30) excludes from usable sales a “[sjale in which several parcels are conveyed as a package deal with an arbitrary allocation of the sale price of each parcel.” As noted above, the Director, through her investigations, also deemed the sale of the Traymore sites non-usable because they were purchased as part of a package deal with the FlamingoLaughlin site, and investigation into the sale revealed an arbitrary allocation (or an allocation based on consideration other than fair market value—i.e. the Internal Revenue Code and business and accounting considerations) of the purchase price to and between the Traymore sites.
It is uncontested that the sale of the Traymore sites was part of a package deal with the Flamingo-Laughlin site. This is supported by evidence entered at trial and testimony heard. Atlantic City does contest, however, the Director’s claim that the $170 million sale price was arbitrarily allocated between the FlamingoLaughlin and the Traymore sites. Atlantic City claims that the allocation was not arbitrary but the product of an arms-length negotiation between a willing and experienced buyer and seller even though the allocation was not made until after the $170 million price had been agreed to. Atlantic City asserts that the allocation was not arbitrary because both parties “were knowledgeable of a market value and, the price per square foot paid for the subject parcels was reflective of the market value for RS-C zoned property.” Atlantic City also asserts the adjustments reflected on the HUD settlement sheet support a finding that the allocation was the product of an arms-length negotiation.
The Director correctly notes, when determining whether a sale constitutes a true market sale, a willing buyer and willing seller presuppose an informed buyer and seller. See U.S. Life Realty Corp. v. Towship of Jackson, 9 N. J.Tax 66, 75 (Tax 1987). In U.S. Life Realty Corp., supra, the court adopted the Appraisal of Real Estate’s definition of market value as:
[tjhe most probable price in cash, terms equivalent to cash, or in other precisely revealed terms, for which the appraised property will sell in a competitive market *18 under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under duress.
[Id. (citing Appraisal of Real Estate, supra, at 33).]
The court in Township of Pennsville v. Director, Div. of Taxation reiterated “[t]o be a willing party, each party must be one Vho is fully informed of all the facts concerning the subject property,’ which facts would include the property’s market value.” 16 N.J.Tax 47, 54 (Tax 1996) (citing Township of West Deptford v. Gloucester County Bd. of Taxation, 6 N.J.Tax 79, 87 (1983); Kingsley v. Div. of Tax Appeals, 40 N.J. 338, 343-44, 192 A.2d 561 (1963)) (emphasis supplied).
In this case, applying New Jersey ease law discussed above, AREP and Harrah’s were not willing buyer and willing seller because they were not informed of the Traymore sites’ fair market values. They agreed to a total price before they allocated prices to the three properties. Atlantic City’s contention that the buyer and seller were aware of the general market values of the surrounding properties does not equate to knowledge of the market value of the subject property—the Traymore sites in this ease—or arms-length negotiations. Because no appraisal was done on the Traymore sites, it is implausible for Atlantic City to contend that buyer and seller were knowledgeable of the Traymore sites’ value, as required by New Jersey case law to be deemed informed parties. It follows that AREP and Harrah’s were not willing buyer and willing seller, and that Atlantic City has not proven the $61 million allocation to the Traymore sites was the sites’ true market value.
Also, if as Atlantic City contends the purchasing parties were separate independent public corporations, then they could not have allocated prices between themselves without a firmer basis than is found in this record. The fact that the acquisition was a package deal for both the Flamingo-Laughlin and Traymore sites gives me no confidence that the sales prices allocated to these three parcels-each separately assessed-refleet an independently arrived at fair market value for each, or in fact any, of those three properties. Since the Director’s and the Atlantic County Board’s *19 ratios compare the individual sales prices to the two separate assessments, even if the $61 million allocation to the two Tray-more sites is correct, there is no assurance that the $58.5 million and $2.5 million allocation between those two properties is correct.
The testimony heard at trial also indicates that the allocation of the $170 million purchase price was not the product of an arms-length negotiation. Ms. Davison testified that there was no factual basis for the allocation of the $170 million between the Flamingo-Laughlin and the Traymore sites. Ms. Buebel testified that the $170 million purchase price, only allocated shortly before closing and not during the negotiations, was based upon an appraisal done on the Flamingo-Laughlin site for $109 million, with the remaining $61 million allocated to the Traymore sites as the residual. Ms. Davison testified that the Director’s investigations also revealed no basis for allocating the $61 million between the Traymore sites ($2.5 million and $58.5 million). I have no basis in the record for judging the accuracy of the appraisal of the Flamingo-Laughlin site. The appraiser was neither examined nor cross-examined in this proceeding. The fact that either or both sides had access to an “appraisal” which they used to allocate a price is not reliable as reflecting the fair market value of the Traymore sites.
Additionally, Atlantic City’s reference to adjustments made in closing is misleading. These adjustments refer to taxes and fees associated with the closing and are not substantive adjustments made in contemplation of a reasoned allocation. More importantly, however, these adjustments were made after the $170 million purchase price was allocated between the Flamingo-Laughlin and Traymore sites. That the closing adjustments occurred subsequent to the initial allocation demonstrates that those adjustments, contrary to Atlantic City’s contention, did not factor into the allocation of the negotiated purchase price.
III.
I next briefly address Atlantic City’s argument that, in determining the usability of sales for purposes of the chapter 123 and *20 county equalization tables under 1530 Owner’s Coip., supra, the real test is whether a subject sale was an arms-length transaction which reflects market value between a willing buyer and willing seller.
Contrary to Atlantic City’s assertion and the court’s holding in 1530 Owner’s Corp., supra, in which the taxpayer at least presented some expert testimony as to the property’s value, Atlantic City in this case has produced absolutely no testimony establishing the basis of the $61 million allocation to, or the $58.5 million and $2.5 million allocation between, the two Traymore sites. No knowledgeable witness testified about the Traymore sites’ true market value. Furthermore, Atlantic City has not proven the exception to usability provided in N.J.A.C. 18:12-1.1(b), because it has not established that the sale meets all other requisites of a usable sale—'i.e., -willing buyer and willing seller, the sites were not an assemblage or a package deal with arbitrary allocation, etc. Such lack of evidence and testimony precludes me from finding that the classification of the sale of the Traymore sites as non-usable (NU-26 or NU-30) was incorrect. Atlantic City has thus failed to establish that the sales prices were reflective of each of the two Traymore sites’ market values.
IV.
Although the Director correctly excluded the sale of the Traymore sites from her calculations in determining Atlantic City’s 2007 school aid and chapter 123 ratios, I also find that Atlantic City could not challenge its chapter 123 ratio except by a timely challenge to its school aid ratio although it may challenge the use of the chapter 123 ratio in an individual tax appeal. The Director has moved to dismiss Atlantic City’s chapter 123 appeal on the grounds that it was filed more than 45 days after the date of promulgation of the chapter 123 table. The Director relies on N.J.S.A. 54:51A-4(c), which provides that the state equalization table promulgated pursuant to (Section 1 of L. 1954, c. 1986, N.J.S.A. 54:1-35.1)
*21 may be reviewed by the tax court on complaint of any taxing district made within 45 days after its promulgation, or on its own motion, but such review shall not suspend the apportionment of school aid moneys.
[N.J.S.A. 54:51 A—4(c). I
The Director argues that because both the school aid and chapter 123 tables were promulgated on October 2, 2006, Atlantic City’s April 18, 2007, appeal of its chapter 123 ratio was outside the 45-day limitations period and thus untimely.
“Munick v. Asbury Park, 95 N.J. 452, 471 A.2d 1196 (1984), permits a taxpayer to attack the Director’s school aid ratio in the context of its use under chapter 123 for local property tax discrimination challenges.” Fort Lee, supra, 12 N.J.Tax at 309. Thus it would appear reasonable that taxing districts also may challenge the use of the chapter 123 ratios in the context of individual tax appeals. Here, however, Atlantic City challenges its 2007 chapter 123 ratio not as part of an individual tax appeal.
This court’s holding in Bellemead Dev. Corp. v. Borough of Roseland, 17 N.J.Tax 155 (Tax 1998), is controlling. In that case, Judge Kahn stated “it should be noted that this court does not have the authority to modify the [c]hapter 123 ratio in a local property tax proceeding.” Id. at 164 (citing Bellemead Dev., Corp. v. Borough of Roseland, 16 N.J.Tax 369 (Tax 1997) (in which the Tax Court held “[tjhis court simply has no authority, in a local property tax assessment proceeding, to change the school aid ratio promulgated by the Director, nor the chapter 123 average ratio (which by statute is the same).”)). “To correct a deviation, ‘a court does not revise the average ratio, but, rather applies the different, revised ratio for purposes of determining the [individual] taxpayer’s entitlement to discrimination relief.’ ” Ibid, (citing Bellemead Dev. Corp. v. Borough of Roseland, supra, 16 N.J.Tax at 372).
Thus, once a school aid ratio is fixed it may no longer be challenged, as the Appellate Division ruled in Atlantic City’s challenge to its 2007 school aid ratio. The chapter 123 ratio may not be challenged separate and apart from a challenge to the state school aid ratio except in the context of an individual tax appeal, and if successfully challenged in that context, then a revised ratio *22 is applicable only in that individual tax appeal. See Bellemead Dev. Corp. v. Borough of Roseland, supra, 16 N.J.Tax at 372.
Consistent with the determinations of this court above, as well as with my February 28, 2007, determination, in which I found Atlantic City’s challenge to its 2007 school aid ratio untimely as it filed its appeal more than 45 days after the October 1, 2006, promulgation, and the Appellate Division’s affirmation of that determination, I find that there is no legal remedy for a flawed chapter 123 table if it has not been addressed in a timely challenge to the school aid table except by raising the issue in the context of an appeal of the tax assessment of a specific property. Because neither of the consolidated appeals under consideration here are in that procedural posture, this court has no jurisdiction to consider Atlantic City’s challenge to its chapter 123 ratio.
This analysis is confirmed by the statement in the Director’s “Certification of Average Ratios and Common Level Ranges for Use in the Tax Year 2007” (the 2007 chapter 123 Table) issued on September 29,2006. This certification provides:
Although there is no formal statutory mechanism for challenging this Certification of Average Ratios and Common Level Ranges, any taxing district objecting to this Certification may appeal the Table of Equalized Valuations to the Tax Court within 45 days after its promulgation, pursuant to N.J.S.A. 54:51A-4(c). Pursuant to N.J.S.A 54:1—35a(a), any revision by the Tax Court to the average ratio in the Table of Equalized Valuations will be reflected by operation of law in a revised Certification of Average Ratios and Common Level Ranges to be issued on or before April 1, 2007. The revised Certification of Average Ratios and Common Level Ranges shall also include a listing of those municipalities, which have implemented a revaluation or reassessment for the Year 2007. No appeal of either Table of Equalized Valuations or Certification of Average Ratios and Common Level Ranges may be taken after the 45 day appeal period has expired.
Having timely failed to challenge its 2007 school aid ratio, Atlantic City was precluded from challenging its 2007 chapter 123 ratio except as it applied to appeals of individual tax assessments. Thus, the chapter 123 appeal is dismissed for lack of jurisdiction rather than for late filing.
The challenge to the 2007 county equalization table, promulgated on April 15, 2007, was filed on April 23, 2007. Atlantic City’s challenge under N.J.S.A. 54:51A-4 is not untimely. However, the *23 factual basis for the challenge to that table, the non-usability of the sale of the Traymore sites, has been rejected.
V.
Por the reasons expressed above, I find that defendants correctly excluded the sales of the two Traymore sites from calculations of the school aid, chapter 123, and county equalization ratios because they were non-usable as both an assemblage and part of a package deal with an arbitrary allocation, and because Atlantic City has not otherwise established that the sale was an arms-length transaction reflective of the two Traymore sites’ fair market values. I reiterate that, while a taxing district may challenge the use of its chapter 123 ratio in the context of an individual tax appeal, it may not challenge that ratio except in that context. Thus, this court lacks jurisdiction to hear Atlantic City’s chapter 123 appeal, even though, as discussed above, Atlantic City has not in this case met its heavy burden to overcome the presumed accuracy of Director’s table. Finally, I find that although the challenge to the 2007 county equalization table was timely filed, Atlantic City has failed to prove that exclusion of the sales of the two Traymore sites from calculations of the table was improper. Accordingly, judgments will be entered dismissing Atlantic City’s challenges to its 2007 chapter 123 and county equalization ratios.

 AREP changed its name to Icahn Enterprises effective September 17, 2007.

 Form SR1-A is used as an initial data gathering instrument prepared by the assessor for purposes of the Director's annual sales ratio study.