**TAX COURT OF NEW JERSEY**



**JOSHUA D. NOVIN**
**Judge**

Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

**NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS**

March 24, 2023

Michael I. Schneck, Esq.
Schneck Law Group, LLC
23 Vreeland Road, Suite 270
Florham Park, New Jersey 07932

Joseph Sordillo, Esq.
DiFrancesco, Bateman, Kunzman, Davis, Lehrer & Flaum, P.C.
15 Mountain Boulevard
Warren, New Jersey 07059

> Re:  Lafayette Sq. Construction Co. LLC v. Montclair Township
> Docket Nos. 012836-2020, 009115-2021, and 007947-2022
>
> and
>
> Union Court LLC v. Montclair Township
> Docket Nos. 012837-2020, 009116-2021, and 007948-2022

Dear Mr. Schneck and Mr. Sordillo:

This letter shall constitute the court's opinion following trial in the local property tax appeals instituted by Lafayette Sq. Construction Co. LLC ("Lafayette Sq.") and Union Court LLC ("Union Court") (Lafayette Sq. and Union Court shall be collectively referred to herein as "plaintiffs"). Plaintiffs challenge the 2020, 2021, and 2022 local property tax assessments on their unimproved properties located in Montclair Township ("Montclair").

For the reasons stated below, the court affirms the 2020, 2021, and 2022 tax year local property assessments.

## I.  **Findings of Fact**

Pursuant to R. 1:7-4, the court makes the following factual findings based on the






evidence and testimony introduced during trial.

Lafayette Sq. is the owner of the real property located at 3 North Willow Street, Montclair Township, Essex County, New Jersey. The real property is identified on Montclair's municipal tax map as block 3206, lot 17 ("Lot 17").

Union Court is the owner of the real property located at 5 North Willow Street, Montclair Township, Essex County, New Jersey. The real property is identified on Montclair's municipal tax map as block 3206, lot 18 ("Lot 18").

Lot 17 and Lot 18 comprise contiguous surface parking lots located near the intersection of North Willow Street and Bloomfield Avenue in Montclair's C-3 Central Business district. The surface parking lots have a total capacity for approximately fifty-five (55) vehicles. A small parking attendant's booth is situated between Lot 17 and Lot 18. Lot 17 serves as the parking lot for the existing adjacent commercial building located on 7 North Willow Street. Lot 18 serves as the parking lot for the existing adjacent commercial building located at 359-367 Bloomfield Avenue/1 North Willow Street. Lot 17 and Lot 18 are illuminated by high-intensity lighting fixtures affixed to the adjacent commercial buildings.

Lot 17 and Lot 18 are both rectangular-shaped parcels. Lot 17 has a depth of approximately 160 feet, approximately 50 feet of frontage along North Willow Street, and a width of approximately 50.75 feet along its rear property line. Lot 17 comprises approximately 0.1853 acres, or 8,073 square feet.[1] Lot 18 has a depth of approximately 160 feet along its northern border, a depth of approximately 165 feet along its southern border, approximately 50

---

[1] Plaintiffs' expert (as defined herein) opined that Lot 17 comprises 0.1837 acres or 8,002 square feet. Montclair's expert (as defined herein) opined that Lot 17 comprises 0.1853 acres, or 8,073 square feet. The court found Montclair's expert's testimony more credible.






feet of frontage along North Willow Street, and a width of approximately 47.50 feet along its rear property line. Lot 18 comprises approximately 0.2021 acres, or 8,803 square feet.[2] Lot 18 is burdened by an access easement (8 feet wide by 160 feet deep) benefitting the rear adjacent parcel (block 3206, lot 2), permitting the owner, tenants, and occupants of the adjacent parcel access to garbage dumpsters located at the easterly end of Lot 18. Lot 17 and Lot 18 are serviced by public utilities, including municipal sewer and water, natural gas, electric, and telephone.

Plaintiffs timely filed complaints challenging the local property tax assessments on Lot 17 and Lot 18 for the 2020, 2021, and 2022 years. Montclair filed counterclaims seeking to raise the local property tax assessments on Lot 17 and Lot 18 for the 2020 and 2022 years. The court tried these matters to conclusion over one day.

Montclair's C-3 Central Business district, permits principal uses including, restaurants and eating and drinking establishments, retail sales, retail food establishments, retail convenience stores, art galleries, art studios, movie studios, recording studios, banks, commercial recreation facilities, educational play centers and public parking decks ("Subsection A"). In addition, the C-3 zone permits the following uses on all upper floors and on the first floor, if located behind a use permitted under Subsection A, including educational or quasi-educational establishments, art studios, gyms and health clubs, general business, and professional offices, municipal, county, state and federal government offices, and nonprofit institutional uses. Further, the C-3 zone permits apartments, provided that such use shall not be permitted on the first floor.

---

[2] Plaintiffs' expert (as defined herein) opined that Lot 18 comprises 0.1836 acres or 8,000 square feet. Montclair's expert (as defined herein) opined that Lot 18 comprises 0.2021 acres, or 8,803 square feet. The court found Montclair's expert's testimony more credible.






Lot 17 and Lot 18 are in Flood Hazard Zone X, denoting an area of minimal flooding risk.

During trial, plaintiffs, and Montclair each offered testimony from a New Jersey certified general real estate appraiser, who were accepted by the court as experts in the field of real property valuation. Each expert prepared an appraisal report containing photographs and data involving Lot 17 and Lot 18, and expressing opinions of the properties true or fair market value.[3] As of each valuation date, the local property tax assessments, implied equalized values, and the experts value conclusions for Lot 17 and Lot 18 are set forth below:

**Lot 17**

| Valuation date | Tax Assessment | Average ratio of assessed to true value | Implied equalized Value | Plaintiffs' expert | Montclair's expert |
|---|---|---|---|---|---|
| 10/1/2019 | $426,300 | 89.51% | $476,260 | $275,000 | $985,000** |
| 10/1/2020 | $426,300 | 88.05% | $484,157 | $320,000 | $985,000** |
| 10/1/2021 | $426,300 | 82.54% | $516,477 | $320,000 | $985,000** |

** Montclair's expert valued Lot 17 and Lot 18 as a single economic unit, and thus concluded one total value for both properties.

**Lot 18**

| Valuation date | Tax Assessment | Average ratio of assessed to true value | Implied equalized Value | Plaintiffs' expert | Montclair's expert |
|---|---|---|---|---|---|
| 10/1/2019 | $423,700 | 89.51% | $473,355 | $275,000 | $985,000** |
| 10/1/2020 | $423,700 | 88.05% | $481,204 | $320,000 | $985,000** |
| 10/1/2021 | $423,700 | 82.54% | $513,327 | $320,000 | $985,000** |

** Montclair's expert valued Lot 17 and Lot 18 as a single economic unit, and thus concluded one total value for both properties.

---

[3] Plaintiffs' expert prepared two distinct and separate appraisal reports, one for Lot 17, and one for Lot 18. However, the comparable vacant land sales and the adjustments made by plaintiffs' expert were identical under both appraisal reports.





## II.   Conclusions of Law

### A.   Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Mountain Lakes Borough, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. See Pantasote Co., 100 N.J. at 413. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of the plaintiff's proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. East Orange City, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)). "Only






after the presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. Summit City, 188 N.J. Super. 34, 38-39 (App. Div. 1982)).

Hence, even in the absence of a motion to dismiss under R. 4:37-2(b), the court is nonetheless required to determine if the party challenging the tax assessment has overcome the presumption of validity. If the court concludes that a challenging party has not carried its burden, dismissal of the action is warranted, under R. 4:40-1, and the trial court need not engage in an evaluation of the evidence to make an independent determination of value.

Affording plaintiffs all reasonable and legitimate inferences which can be deduced from the evidence presented, the court concludes that plaintiffs have produced cogent evidence sufficient to overcome the presumption of validity that attaches to the local property tax assessments for Lot 17 and Lot 18. If accepted as true, the opinions of plaintiffs' expert and the facts upon which he relied raise debatable questions regarding the correctness of the 2020, 2021, and 2022 tax years assessments on Lot 17 and Lot 18.

However, concluding that the presumption of validity has been overcome does not equate to a finding by the court that the local property tax assessments are erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992).

B. Highest and Best Use

"For local property tax purposes, property must be valued at its highest and best use."






Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000).  The determination of the highest and best use of a property is "the first and most important step in the valuation process." Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988).  The highest and best use analysis involves the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive."  Clemente v. South Hackensack Twp., 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015).

In plaintiffs' expert's opinion, although Lot 17 and Lot 18 are contiguous and operated as surface parking lots, no common ownership exists between Lafayette Sq. and Union Court. Therefore, in his opinion, Lot 17 and Lot 18 must be viewed and valued independent of one another.

Here, after considering all legally permitted and physically possible uses allowed in Montclair's C-3 Central Business district, plaintiffs' expert concluded that variance relief would be a prerequisite to developing Lot 17 and Lot 18 in any manner.  Further, because Montclair's C-3 Central Business district requires a minimum lot area of 10,000 square feet for non-residential uses and Lot 17 contains approximately 8,073 square feet and Lot 18 contains approximately 8,806 square feet, lot size variances would be required for development of each lot.  In addition, Montclair's C-3 Central Business district requires minimum lot frontage of 60 feet for non-residential uses and Lot 17 and Lot 18 each contain approximately 50 feet of frontage, thus variances for lot frontage would also be required.  However, assuming that lot size and lot frontage variances can be secured, plaintiffs' expert expressed that a variety of uses are legally permitted and physically possible on Lot 17 and Lot 18 including "retail, [and] mixed-use






retail/residential."

Moreover, after considering the financially feasible and maximally productive uses on Lot 17 and Lot 18, plaintiffs' expert concluded that, as vacant, the highest and best use of each lot is for commercial development, assuming that lot size and lot frontage variances were obtained.

Conversely, although Lot 17 and Lot 18 are owned by different entities, in Montclair's expert's opinion, "the underlying ownership of both properties is identical, it's Mr. [Steven] Plofker, he is the individual who signed and certified to the interrogatories for both properties."

Therefore, after considering all legally permitted and physically possible uses allowed in Montclair's C-3 Central Business district, Montclair's expert observed that, "each lot was substandard, with regard to minimum lot size in the C-3 zone, however, as you've got unity of title, unity of use, there's no way that given this common ownership that anyone would develop these parcels independent of each another, they would not go through the risk, time, expense, cost involved in getting variances and approvals, as a combined lot they would readily conform with the zoning requirements of the C-3 zone." Thus, Montclair's expert valued Lot 17 and Lot 18 "as one economic unit, the way it is being held, and being utilized."

Accordingly, after considering all legally permitted, physically possible, financially feasible, and maximally productive uses, Montclair's expert opined that the highest and best use of Lot 17 and Lot 18, is as a single economic unit, for a "mixed-use development including retail uses on the first floor and residential apartment on the upper floors."[4]

---

[4] Montclair's expert further expressed that the present use of Lot 17 and Lot 18, as surface parking lots, is a legally permitted use, but that he viewed it only an interim or temporary use.

   

Under certain circumstances, separate and distinct parcels may be considered and valued as a single economic unit. See City of Atlantic City v. Ginnetti, 17 N.J. Tax 354, 363 (Tax 1998), aff'd, 18 N.J. Tax 672 (App. Div. 2000); Purex Corp. v. City of Paterson, 8 N.J. Tax 121 (Tax 1986); Mobil Oil Corp. v. Township of Greenwich, 9 N.J. Tax 123 (Tax 1986); Jaydor Corp. v. Millburn Twp., 17 N.J. Tax 378 (Tax 1998); EGDC C/O AM Resurg Mgmt v. Rutherford Borough, 31 N.J. Tax 272, 279 (Tax 2019). Importantly however, to demonstrate that multiple properties comprise a single economic unit, the proponent must prove that a unity of use and a unity of ownership exists between the properties. Housing Auth. of Newark v. Norfolk Realty Co., 71 N.J. 314, 322-24 (1976).

A unity of use is established when there is "a connection or relation of adaptation, convenience and actual . . . use to make the enjoyment of one [parcel] reasonably necessary to the enjoyment of the other [parcel]. . . ." Manalapan v. Genovese, 187 N.J. Super. 516, 521 (App. Div. 1983). Thus, when separately assessed parcels are integral parts of an operation, an appraiser may develop an opinion of value that considers the entire economic unit and how the individual component parts contribute to the value of the whole. See Purex Corp., 8 N.J. Tax 121; Mobil Oil Corp., 9 N.J. Tax 123; and Ginnetti, 17 N.J. Tax at 362-63.

Further, the unity of ownership component contemplates "that physically separate parcels are owned in their entirety by one owner or set of owners . . . [however, the concept] is flexible and does not require a rigid definition of ownership on the basis of bare legal title." Union County Imp. Auth. v. Artaki, LLC, 392 N.J. Super. 141, 149 (App. Div. 2007). As stated by our Supreme Court,

> the realities underlying corporate ownership of land [must] be
> fairly recognized. Normal business considerations, including due






regard for federal tax consequences, may indicate that a bifurcated ownership of the assets of a functionally integrated enterprise is more desirable than ownership by a single entity. The law should not require businessmen to ignore otherwise sensible economic planning decisions in order to retain their right to full actual damages consequent upon a public taking.

[Housing Auth. of Newark, 71 N.J. at 322-24.]

Thus, when attempting to discern whether a unity of ownership exists between two properties it "is a matter of substance rather than form so that identity of beneficial interest will suffice." Id. at 324.

Here, the only evidence presented by Montclair that a unity of ownership exists between Lafayette Sq. and Union Court is Montclair's expert's statement that "underlying ownership of both properties is identical Mr. [Steven] Plofker, he is the individual who signed and certified to the interrogatories for both properties." Although Montclair's expert's observation is accurate, insofar that Mr. Plofker signed and certified the Answers to Interrogatories on behalf of Lafayette Sq. and Union Court, Montclair's expert failed to offer any evidence demonstrating that his unity of ownership conclusion was supported by any other facts or data. Cross-examination revealed that Montclair's expert did not review the operating agreements of Lafayette Sq. or Union Court. Montclair's expert did not know what relationship Mr. Plofker has to Lafayette Sq. or Union Court. Moreover, Montclair's expert did not know if Mr. Plofker was the sole member, whether there were other members of Lafayette Sq. or Union Court, and, other than Mr. Plofker, whether there was any other commonality of ownership between Lafayette Sq. and Union Court. In sum, the court cannot conclude from the evidence presented that Lafayette Sq. and Union Court are principally owned by the same individual, series of individuals, or are part of an integrated business enterprise. Accordingly, the court finds that






Montclair has failed to adequately prove that a unity of ownership exists between Lafayette Sq. and Union Court. Therefore, the court rejects Montclair's expert's conclusion that Lot 17 and Lot 18 should be valued as a single economic unit.

However, because both experts concluded that the highest and best use of Lot 17 and Lot 18 was for commercial development, the court will examine the evidence offered by plaintiffs' expert and Montclair's expert to attempt to discern the true or market value of each Lot 17 and Lot 18.

C.    Valuation

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); see also ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001), certif. denied, 168 N.J. 291 (2001) (citation omitted)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537, 544 (1963)); see also WCI-Westinghouse, Inc. v. Edison Twp., 7 N.J. Tax 610, 619 (Tax 1985).

Here, both experts testified that they considered all three approaches to value, however,






plaintiffs' expert and Montclair's expert both agreed that the sales comparison approach was the most appropriate method to derive the estimated true or fair market value for Lot 17 and Lot 18.

The sales comparison approach is predicated upon an evaluation of market transactions involving the recent sale of similar properties. This approach involves a "comparative analysis of properties" and requires the appraiser to focus on the "similarities and differences that affect value . . . which may include variations in property rights, financing, terms, market conditions and physical characteristics." Appraisal Institute, The Appraisal of Real Estate, 378 (14th ed. 2013). "When data is available, this [approach] is the most straightforward and simple way to explain and support an opinion of market value." Greenblatt, 26 N.J. Tax at 53. The framework underlying the sales comparison approach is that "an opinion of the market value of a property can be supported by studying the market's reaction to comparable and competitive properties." The Appraisal of Real Estate, at 377. Thus, the efficacy and suitability of the sales comparison approach is dependent upon the sufficiency of the data on recent market transactions and the appraiser's detailed analysis of that data.

When engaging in a sales comparison approach, similarities must exist between the subject property and the comparable properties. "Evidence of comparable sales is effective in determining value only where there is a substantial similarity between the properties." Venino v. Carlstadt Borough, 1 N.J. Tax 172, 175 (Tax 1980), aff'd o.b., 4 N.J. Tax 528 (App. Div. 1981). However, comparability does not require properties to be identical, "differences between a comparable property and the subject property are anticipated. They are dealt with by adjustments recognizing and explaining these differences, and then relating the two properties to each other in a meaningful way so that an estimate of the value of one can be determined from






the value of the other." U.S. Life Realty Corp. v. Jackson Twp., 9 N.J. Tax 66, 72 (Tax 1987). Thus, a fundamental predicate of the sales comparison approach requires that evidence "be based on 'sound theory and objective data,' rather than on mere wishful thinking." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376 (quoting FMC Corp. v. Unmack, 92 N.Y. 2d 179, 188 (1998)). An appraiser must establish appropriate "elements of comparison for a given appraisal through market research and support those conclusions with market evidence." The Appraisal of Real Estate, at 390. Hence, the probative value of the sales comparison analysis hinges upon the similarities and differences which can be drawn, and the objective market data utilized to support adjustments thereto.

      1.    Plaintiffs' expert

In performing his sales comparison approaches, plaintiffs' expert identified six (6) vacant land sales that sold between May 2019 and October 2021. The vacant land sales are in: (1) West Caldwell (Essex County); (2) Nutley (Essex County); (3) Clifton (Passaic County); (4) West Orange (Essex County); (5) Kearny (Hudson County); and (6) Lyndhurst (Bergen County). According to plaintiffs' expert the permitted uses in each municipal zoning district where the comparable vacant land sales are located were substantially akin to the permitted uses in Montclair's C-3 Central Business district. The unadjusted sale prices of the six vacant land sales ranged from $420,000 to $1,175,000, or approximately $797,872 to $2,444,444 per acre. Plaintiffs' expert relied on vacant land sales 1, 2, and 3, for the October 1, 2019 valuation date, and vacant land sales 1, 2, 3, 4, 5, and 6, for the October 1, 2020 and October 1, 2021 valuation dates.

Plaintiffs' expert applied adjustments to each comparable vacant land sale, ranging from






10% to 17.50% to account for their perceived inferior locations.  To arrive at his adjustment, plaintiffs' expert compared and contrasted CoStar's reported average rental rates for Montclair with CoStar's reported average rental rates for West Caldwell, Nutley, Clifton, West Orange, Kearny, and Lyndhurst.  Based on that comparison, plaintiffs' expert found that the average rental rates in Montclair were: (i) 10% higher than West Caldwell and West Orange; (ii) 12.5% higher than Kearny; (iii) 15% higher than Clifton; and (iv) 17.5% higher than Nutley and Lyndhurst.  Accordingly, plaintiffs' expert opined that because Montclair's rental rates were higher, the corresponding value of real property in Montclair would be higher and applied a location adjustment of: (i) 10% to vacant land sales 1 and 4; (ii) 17.5% to vacant land sales 2 and 6; (iii) 15% to vacant land sale 3; and (iv) 12.5% to vacant land sale 5.

Further, in attempting to discern whether an adjustment was required to Lot 17 and Lot 18 to account for lot size and lot frontage variances, plaintiffs' expert testified that, "it's something we considered, but it's not something that we adjusted off of because, in my opinion, it's almost an impossible adjustment to support."

Accordingly, after applying the location adjustments, the adjusted sale prices of plaintiffs' expert's six comparable vacant land sale transactions ranged from: (i) $877,659 to $2,504,700 per acre (or $20.15 to $57.50 per square foot), as of the October 1, 2019 valuation date; and (ii) $877,659 to $2,750,000 per acre (or $20.15 to $63.13 per square foot), as of the October 1, 2020 and October 1, 2021 valuation dates.[5]  Ultimately, plaintiffs' expert concluded a fair market value of $1,500,000 per acre (or $34.44 per square foot), as of the October 1, 2019 valuation date, and $1,750,000 per acre (or $40.17 per square foot), as of the October 1, 2020

---

[5] Plaintiffs' expert calculated his values on a per acre basis.  The court converted those values into a square foot value to compare and contrast same to Montclair's expert's valuations.






and October 1, 2021 valuation dates. Plaintiffs' expert then applied his concluded, per acre value, to the estimated lot sizes of Lot 17 and Lot 18.

In sum, plaintiffs' expert concluded a $275,000 value for Lot 17 as of October 1, 2019 valuation date, and $320,000 value for Lot 17 as of October 1, 2020 and October 1, 2021 valuation dates. Similarly, plaintiffs' expert concluded a $275,000 value for Lot 18 as of October 1, 2019 valuation date, and $320,000 value for Lot 18 as of October 1, 2020 and October 1, 2021 valuation dates.

### 2. Montclair's expert

In performing his sales comparison approach, Montclair's expert identified four (4) vacant land sales that sold between April 2016 and October 2018. The vacant land sales are in: (1) Montclair (Essex County); (2) Caldwell (Essex County); (3) Nutley (Essex County); and (4) Montclair (Essex County). According to Montclair's expert, the permitted uses in each municipal zoning district where the comparable vacant land sales are located were substantially akin to the permitted uses in Montclair's C-3 Central Business district, including first floor retail, commercial, second floor residential, offices, etc. The unadjusted sale prices of the four vacant land sales ranged from $524,000 to $2,550,000, or approximately $1,901,830 to $3,277,890 per acre ($43.66 to $75.25 per square foot).[6] Montclair's expert relied on all four sales as of the October 1, 2019, October 1, 2020, and October 1, 2021 valuation dates.

Montclair's expert applied a -10% adjustment to comparable vacant land sales 1 and 3 because they were sold with development approvals in place, whereas Lot 17 and Lot 18 possessed no development approvals. To calculate his development approvals adjustment,

---

[6] Montclair's expert calculated his values on a square foot basis. The court also converted those values into a per acre value to compare same to plaintiffs' expert's valuations.






Montclair's expert conducted a paired sales analysis of vacant land sales 2 and 4 (sold without development approvals), with vacant land sales 1 and 3 (sold with development approvals). His analysis revealed that vacant land sales 1 and 3 sold for approximately $64.09 per square foot, in comparison to vacant land sales 2 and 4 which sold for approximately $59.44 per square foot, or a difference of approximately 7.82%. In Montclair's expert's opinion, the difference in sales price was attributed to the presence or lack of development approvals. Accordingly, Montclair's expert applied a -10% adjustment to vacant land sales 1 and 3 to account for the presence of development approvals in those transactions.

Accordingly, after applying the development approvals adjustments, the adjusted sale prices of Montclair's expert's four comparable vacant land sales ranged from $1,901,830 to $3,277,890 per acre, or $43.66 to $75.25 per square foot. Ultimately, Montclair's expert concluded a value of $2,548,260 per acre, or $58.50 per square foot, and a combined value of $985,000 (16,879 sq. ft. x $58.50 per square foot = $985,000) for Lot 17 and Lot 18, as of the October 1, 2019, October 1, 2020, and October 1, 2021 valuation dates.

3. Court's analysis

At the outset, the court highlights that it finds the adjustments applied by the experts to the comparable vacant land sales for location and development approvals to be generally credible and supported by the experts analysis of relevant market data.

However. as this court explained in VBV Realty, LLC v. Scotch Plains Twp., 29 N.J. Tax 548, 561 (2017):

> when employing the sales comparison approach appraisers must adhere to 'systematic procedure[s].' Appraisers must conduct research of the competitive marketplace for "information on properties that are similar to the subject property" and that have






recently sold. A crucial element of this investigation and research involves the data verification process. An appraiser must verify the integrity of the information by "confirming that the data obtained is factually accurate and that the transactions reflect arm's-length market considerations." During the data verification process an appraiser must 'elicit additional information about the property such as buyer motivation, economic characteristics, [and] value component allocations . . . to ensure that comparisons are credible.' The process demands an appraiser 'verify information with a party to the transaction to ensure its accuracy and gain insight into the motivation behind each transaction.' An appraiser must endeavor to confirm 'statements of fact with the principals to the transaction . . . or with brokers, closing agents, or lenders involved.'

[Ibid. (internal citations omitted).]

Moreover, the court emphasized that in all Tax Court proceedings, our Legislature has mandated that,

any person being offered as a witness with respect to the review of a local property tax assessment shall possess information or knowledge regarding comparable properties acquired from owners, sellers, purchasers, lessees, brokers or attorneys who were a party to, or participated in, the transaction. N.J.S.A. 2A:83-1.

[VBV Realty, LLC, 29 N.J. Tax at 562.]

Specifically, N.J.S.A. 2A:83-1 requires that,

in any action or proceeding in the Tax Court, any person offered as a witness in any such action or proceeding shall be competent to testify as to sales of comparable land, including any improvements thereon, contiguous or adjacent to the land in question, or in the vicinity or locality thereof, or otherwise comparable, from information or knowledge of such sales, obtained from the owner, seller, purchaser, lessee or occupant of such comparable land, or from information obtained from the broker or brokers or attorney or attorneys who negotiated or who are familiar with or cognizant of such sales, which testimony when so offered, shall be competent and admissible evidence in any such action or proceeding.

[N.J.S.A. 2A:83-1 (emphasis added).]






Here, both plaintiffs' expert's testimony and Montclair's expert's testimony revealed that they did not verify the facts and data for each comparable vacant land sale transaction upon which their value conclusions were premised.

According to plaintiffs' expert, he did not consult with the seller, purchaser, attorneys for the seller or purchaser, or the listing or purchasing real estate brokers involved in his comparable vacant land sale transactions 2, 3, and 4. Admittedly, plaintiffs' expert stated, "we confirmed with the deed, we were unable to speak with anyone related to the parties . . . we reviewed the deeds, the tax maps and all that. . . ." Thus, the information recited in plaintiffs' expert's appraisal reports and his trial testimony involving comparable vacant land sales 2, 3 and 4 was obtained only from his review of CoStar listings or plaintiffs' expert's review of recorded deeds and tax maps.

Similarly, Montclair's expert did not verify his comparable vacant land sale 2 with the seller, purchaser, attorneys for the seller or purchaser, or the listing or purchasing real estate brokers involved with his comparable vacant land sale 2. Thus, the information recited in Montclair's expert's appraisal report, and his trial testimony involving comparable vacant land sale 2 was based solely on his discussions with Caldwell Township's business administrator and his review of a recorded deed.

Whether a sales transaction can be considered a reliable indicator of true or fair market value depends on an analysis of the following criteria: (i) whether the buyer or the seller were unusually motivated, (ii) whether the buyer and seller were well-advised and acting prudently, (iii) the length of time that the property was exposed to an open and competitive marketplace, (iv) whether the purchase price was paid in cash, and (v) whether the purchase price was affected






by special or creative financing.  Venture 17, LLC v. Borough of Hasbrouck Heights, 27 N.J.

Tax 108, 126 (Tax 2013) (citing Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J.

Tax 68, 94 (Tax 1996)).

As the court further observed in VBV Realty, LLC,

> [i]n recognizing the pitfalls which exist with information reported
> on public websites and real estate multiple listing service websites,
> the Appraisal Institute cautions appraisers that while 'the service
> will contain fairly complete information about these properties,
> including descriptions and brokers' names . . . details about a
> property's square footage, basement area, or exact age may be
> inaccurate or excluded.'  The Appraisal of Real Estate, supra, at
> 119. In fact, most local residential and commercial real estate
> listing service websites contain express disclosures about the
> accuracy of the data and information contained therein.
>
> [Id. at 563.]

The data source relied on by plaintiffs' expert, CoStar, contains a disclosure expressly

limiting their liability with respect to the accuracy, completeness, and timeliness of the reported

information.  The disclosure provides, in part, that,

> Any reliance upon the Product shall be at your own risk.  Neither
> we, nor any third party involved in creating, producing or
> delivering the Product, is responsible if the Product is not accurate,
> complete or current. Neither we, nor any third party involved in
> creating, producing or delivering the Product, has any
> responsibility for any consequence relating directly or indirectly to
> any action or inaction that you take based on the Product.
>
> [https://www.costar.com/about/terms-conditions   (last   visited
> March 23, 2023).]

In sum, plaintiffs' expert possessed no firsthand knowledge about his comparable vacant

land sales 2, 3 and 4, nor did he obtain any information from the seller, purchaser, real estate

brokers, or attorneys engaged in those transactions, as required under N.J.S.A. 2A:83-1.






Additionally, Montclair's expert possessed no firsthand knowledge about his comparable vacant land sale 2, nor did he obtain any information from the seller, purchaser, real estate brokers, or attorneys engaged in those transactions, as required under N.J.S.A. 2A:83-1.

Accordingly, because plaintiffs' expert and Montclair's expert's failed to comply with N.J.S.A. 2A:83-1, ensuring that those comparable sales were a reliable indicator of true or fair market, the court strikes plaintiffs' expert's comparable vacant land sales 2, 3, and 4 from consideration, and strikes Montclair's expert's comparable vacant land sale 2 from consideration.

In addition, cross-examination of Montclair's expert revealed that his comparable vacant land sale 4 was comprised of three separate parcels, conveyed under three separate deeds (all deeds apparently bearing the same date), from two different sellers (one seller who were individuals and one seller who was a limited liability company), into two different purchasing entities.

In New Jersey, our courts traditionally define an assemblage as the cost to acquire "contiguous property owned by others in order to create a single integrated unit." County of Monmouth v. Hilton, 334 N.J. Super. 582, 584 (App. Div.2000); see also Appraisal Institute, The Dictionary of Real Estate Appraisal, 12 (5th ed. 2010) (defining assemblage as "the combining of two or more parcels, usually but not necessarily contiguous, into one ownership or use"). When analyzing an assemblage, a primary consideration is whether the parcels purchase prices represent true or fair market value, whether a premium was paid for one or more of the parcels, or whether there was an arbitrary allocation of sales price among the parcels. See City of Atl. City v. Dir., Div. of Taxation, 24 N.J. Tax 1, 14 (2008), aff'd, 25 N.J. Tax 280 (App. Div. 2009). Thus, an assemblage may raise questions about whether true or fair market value has been paid






for a parcel, or whether the purchase price allocated on the deed or deeds to one or more parcels comprising the assemblage, was arbitrarily assigned.

Here, Montclair's expert testified that he did not consider these transactions an assemblage because "no premium was paid," and that he verified the details of his comparable vacant land sale 4 with the purchaser or the purchaser's employee. However, the court observes that the acquiring entities bore two different names, Greenwood Partners, LLC, and Walnut Grove Partners, LLC. Moreover, Montclair's expert did not know and could not state whether the sellers were related parties. Montclair's expert also did not know if the individual sellers were also members of the limited liability company seller. Further, cross-examination of Montclair's expert revealed that sometime after the parcels were sold to Greenwood Partners, LLC and Walnut Partners, LLC, the properties were apparently further merged into either one lot or by deed under one owner.[7] Thus, without an adequate understanding of the transaction and the potential relationship of the sellers and relationships of the two different purchasing entities, the court questions the reliability and accuracy of Montclair's expert's comparable vacant land sale 4. Accordingly, for the foregoing reasons, the court attributes no weight to Montclair's expert's comparable vacant land sale 4.

### 4.   Reconciliation

The following chart reconciles the adjustments offered by the experts, accepted by the court, and applied to each comparable vacant land sale found by the court to be credible evidence of the true or fair market value of Lot 17 and Lot 18, as of the October 1, 2019, October 1, 2020, and October 1, 2021 valuation dates.

---

[7] During cross-examination, Montclair's expert testified that "they've been merged into one lot, subsequently."






| Location | 1148-1154 Blmfld. Ave. W. Caldwell, NJ | 936 Passaic Ave. Kearny, NJ | 640-644 Ridge Rd. Lyndhurst, NJ | 256 Park St. Montclair, NJ | 274 Blmfld. Ave. Nutley, NJ |
|---|---|---|---|---|---|
| Sale price | $750,000 | $1,100,000 | $420,000 | $1,215,000 | $1,615,000 |
| Lot Size | 0.94 acres | 0.45 acres | 0.223 acres | 0.437 acres | 0.508 acres |
| Price Per Acre | $797,872 | $2,444,444 | $1,883,408 | $2,781,306 | $2,803,086 |
| Price P.S.F. | $18.32 | $56.12 | $43.24 | $63.85 | $64.35 |
| Location Adj. | $79,787 | $305,555 | $329,596 | N/A | N/A |
| Development Approvals Adj. | N/A | N/A | N/A | ($278,131) | ($280,309) |
| **Adj. Price Per Acre** | **$877,660** | **$2,750,000** | **$2,213,004** | **$2,503,175** | **$2,522,777** |
| **Adj. Price P.S.F.** | **$20.15** | **$63.13** | **$50.80** | **$57.46** | **$57.91** |

Affording each of the five comparable vacant land sales equal weight, the court concludes that the true or fair market value of the real property is $2,500,000 per acre, or $57.39 per square foot. Accordingly, Lot 17 has a true or fair market value of $463,300 (8,073 sq. ft. x $57.39 p.s.f. = $463,309), as of the October 1, 2019, October 1, 2020, and October 1, 2021 valuation dates, and Lot 18 has a true or fair market value of $505,400 (8,806 sq. ft. x $57.39 p.s.f. = $505,376), as of the October 1, 2019, October 1, 2020, and October 1, 2021 valuation dates.

D.    Corrected local property tax assessment

Having reached a conclusion of the true or fair market value of Lot 17 and Lot 18, the court will turn its attention to determining the correct tax assessments for Lot 17 and Lot 18 for the 2020, 2021, and 2022 tax years.

Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the






property by applying the average ratio to the true value of the property. . . ." N.J.S.A. 54:51A-6(a). This process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b). When the ratio of assessed value exceeds the upper limit or falls below the lower limit, the formula for determining the revised taxable value of property, under N.J.S.A. 54:51A-6(a), is as follows:

| true market value | x | average ratio | = | revised taxable value |
|---|---|---|---|---|

1. Lot 17

For the 2020 tax year, the ratio of assessed value, $426,300, to true or fair market value, $463,300, yields a ratio of 92.01% ($426,300/$463,300 = 0.9201), which falls squarely between Montclair's 2020 tax year Chapter 123 common level range upper limit of 103.76% and lower limit of 76.70%. Consequently, no reduction or increase in the 2020 tax year assessment for Lot 17 is warranted.

For the 2021 tax year, the ratio of assessed value, $426,300, to true or fair market value, $463,300, yields a ratio of 92.01% ($426,300/$463,300 = 0.9201), which falls squarely between Montclair's 2021 tax year Chapter 123 common level range upper limit of 101.26% and lower limit of 74.84%. Consequently, no reduction or increase in the 2021 tax year assessment for Lot 17 is warranted.

For the 2022 tax year, the ratio of assessed value, $426,300, to true or fair market value, $463,300, yields a ratio of 92.01% ($426,300/$463,300 = 0.9201), which falls squarely between Montclair's 2022 tax year Chapter 123 common level range upper limit of 94.92% and lower limit of 70.16%. Consequently, no reduction or increase in the 2022 tax year assessment for Lot 17 is warranted.

   

2. Lot 18

For the 2020 tax year, the ratio of assessed value, $423,700, to true or fair market value, $505,400, yields a ratio of 83.83% ($423,700/$505,400 = 0.8383), which falls squarely between Montclair's 2020 tax year Chapter 123 common level range upper limit of 103.76% and lower limit of 76.70%. Consequently, no reduction or increase in the 2020 tax year assessment for Lot 18 is warranted.

For the 2021 tax year, the ratio of assessed value, $423,700, to true or fair market value, $505,400, yields a ratio of 83.83% ($423,700/$505,400 = 0.8383), which falls squarely between Montclair's 2021 tax year Chapter 123 common level range upper limit of 101.26% and lower limit of 74.84%. Consequently, no reduction or increase in the 2021 tax year assessment for Lot 18 is warranted.

For the 2022 tax year, the ratio of assessed value, $423,700, to true or fair market value, $505,400, yields a ratio of 83.83% ($423,700/$505,400 = 0.8383), which falls squarely between Montclair's 2022 tax year Chapter 123 common level range upper limit of 94.92% and lower limit of 70.16%. Consequently, no reduction or increase in the 2022 tax year assessment for Lot 18 is warranted.

## III. Conclusion

For the foregoing reasons, the court affirms the 2020, 2021, and 2022 tax year assessments on Lot 17 and Lot 18. The court shall enter judgments accordingly,

Very truly yours,

Hon. Joshua D. Novin, J.T.C.


Interpreter


ADA
Americans with
Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE

